## WILLIAM CROSS *vs.* STATE OF MARYLAND.

*Criminal law: evidence; statements and actions of accused just
before the crime; irrelevant or conjectural testimony.
Witness: corroboration by proof of own declarations
to third parties; statements at coroner's
inquest. Charge to jury: appeal.*

In a criminal prosecution, evidence of what the traverser said,
and his accompanying acts, a short time before the occur-
rence of the offense charged, is admissible for the purpose of
showing he was then in a reckless and wilful frame of mind—
one likely to result in wrongdoing.       p. 662

It is not permissible for the State to introduce in a criminal
prosecution testimony that is wholly conjectural, and of
which there is no evidence in the case, and if such evidence
is misleading, and prejudicial to the defendant, it constitutes
reversible error.       p. 668

Where the credibility of a witness is attacked by the opposite
party, his prior statements may be given in evidence to show
his consistency.       p. 670

By the Act of 1874, Ch. 385 (Code 1912, Art. 35, sec. 3), it
is only parties to a cause, who are examined as witnesses,
that are forbidden to corroborate their testimony, if im-
peached, by proof of their own declarations or statements
previously made to third parties.       p. 671

Witnesses who were present at coroner's inquest the day after a
murder, may testify to what a witness there said, in order to
corroborate what he subsequently testified to at the trial, and
to support his accuracy and integrity.       p. 672

On appeal by the accused in a criminal prosecution, the Court
will not review the charge to the jury contained in the record,
where the same is not properly presented.       p. 672

*Decided November 15th, 1912.*

William Cross having been indicted for the murder of
John Elmer Scadden, was tried in the Circuit Court of
Washington County (KEEDY, J.), and being convicted of

murder in the second degree and sentenced to 12 years in the Maryland Penetentiary, took an appeal.

The appeal was argued before BOYD, C. J., PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*A. J. Long* and *Frank G. Wagaman,* for the appellant.

*Edgar Allan Poe* (with *Scott M. Wolfinger* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

William Cross, the appellant, was convicted of murder in the second degree in the Circuit Court for Washington County. In the course of the trial a number of exceptions were taken by the appellant to the rulings of the Court upon the admission of testimony.

The first exception is to the ruling of the Court in admitting a conversation had by the appellant with the deceased, John Elmer Scadden, and his sister, Stella, on the day, and only a short time before, the alleged offense was committed, at the home of their father, Charles Scadden, with whom they resided.

Stella Scadden, the sister, testified that about twelve o'clock on the day that her brother was killed the defendant came to the home of her father. The evidence discloses that both the defendant and the deceased in the morning of that day and immediately before going to the home of Charles Scadden, had been drinking heavily, and while there the defendant exhibited a pistol, which the witness said he drew upon her brother. The witness, Stella Scadden, was asked, "Tell the jury what you saw Cross do with that gun on that occasion." This question was objected to by the defendant. The Court overruled the objection and the witness was permitted to answer it. In answer thereto she said, "He came there in our house in the morning and told Elmer he would give him

three or five minutes to get ready, and Elmer was standing before the glass fixing his collar and tie, and he said, 'Oh, you will give me more than that'; he said, 'No, it is 20 minutes past 1 o'clock'; I said, 'No, 12 o'clock'; he said, 'Where is your clock'? he said, 'Let me shoot at it'; I said, 'Put that in your pocket before you shoot anybody'; he said, 'By Hell, I am going to shoot the town up today'; he drew it out and drew it right behind Elmer's head and wanted me to leave him shoot at the clock and I said 'No, put that away before you shoot anybody'. Then by this time Elmer was ready and Elmer went out first and he followed."

The ruling of the Court in permitting this question to be asked and answered forms the first bill of exceptions.

It is not denied by the defense that the pistol was in the hands of the defendant at the time of its discharge, and that the death of the deceased was the result of such discharge, but it contends that the pistol was accidentally discharged. This statement and the accompanying acts of the defendant, who was at that time armed with a dangerous weapon and recklessly exhibiting it, at least show that the defendant was in a wreckless and evil disposed frame of mind, one likely to result in wrongdoing, existing at a period only a short time prior to the alleged offense complained of. We, therefore, think the testimony admissible. The weight and force of it was for the jury to determine. *Kernan* v. *State,* 65 Md. 253; *Ency. of Evidence,* Vol. 6, page 653.

The next witness placed upon the stand was Oscar Reynolds. He testified that in the latter part of November or the first of December, the month in which Elmer Scadden was killed, he had husked corn with the deceased. He was then asked, "Did you or not while you were husking corn there have a conversation with William Cross, in which he stated to you about the Scadden family, or any member of the Scadden family?" Upon objection being made to this question, a statement was made by the State's Attorney that he wished to prove by this witness that at such time, while witness was husking corn with Cross, that Cross told him

"Bet Scadden was trying to get him into trouble (Bet Scadden being the mother of the deceased), and that she had said things about him with the view of getting him into trouble, and that somebody was getting too familiar about his place, and that he proposed to get as drunk as hell some day and shoot up the place or the town." The Court overruled the objection of the defense and permitted the witness to testify to the conversation, omitting the part which referred to Mrs. Scadden. This ruling of the Court forms the second bill of exceptions.

The witness, omitting from the conversation such parts as specifically referred to Mrs. Scadden, as directed by the Court, answered the question, saying that Cross said: "Some people were getting too familiar around there or fast, something like that he said, and he was going to get on a hell of a drunk and shoot up the town." And he further testified that Cross, in saying that some people were getting too familiar around *there,* meant getting too familiar or too fast around *his place.* The defense then moved to strike out that part of the testimony of the witness wherein he construed the meaning of the defendant in saying "around there" to be "around his place," and upon the refusal of the Court to strike out this part of his testimony an exception to the ruling of the Court was taken, which forms the third bill of exceptions.

The witness then testified that the deceased in the last two years was frequently at the home of the defendant; he saw him there quite often, in the day time and in the evening. He was then asked "Do you know whether or not he was ever at Mr. Cross' house on occasions when Cross was absent from the house?" This question was objected to by the defense, but the objection was overruled by the Court, to which an exception was taken, forming the fourth bill of exceptions.

In answer to the question last objected to, the witness testified that he saw him one morning when Cross was not at home coming out of the gate; that Cross never said anything to him about Scadden coming to his home; that they

(the defendant and deceased) were very much together, "that they were always together when Elmer was around home and Mr. Cross was around home," and that they were great friends, or at least acted as such so long as Scadden lived.

We will consider the second, third and fourth exceptions together.

The evidence discloses that this homicide occurred in what is called Bagtown, in or about which place both the defendant and deceased lived. The deceased, on Saturday night preceding the Sunday, the day upon which he lost his life, went to Smithsburg and there bought a quart of whiskey. This he brought home with him and on Sunday morning was at the house of the defendant so early as seven o'clock. The defendant and his wife were at home. After talking with them for a while he asked the defendant to take a drink of whiskey, which he did. He then suggested that they should go to Detrow's, who lived near by, and while there they drank the balance of the whiskey. From Detrow's they started to the home of Charles Scadden. On their way they heard the hounds running a fox upon the mountain and as they reached the home of the defendant, which they passed in going to the home of Charles Scadden, it was suggested by the deceased, as testified by the defendant, that he get his pistol, thinking they might get a chance to shoot the fox; and thus they stopped at the defendant's house and were there about a half hour, and while there and as they were about to leave, as testified by defendant's wife, the deceased said to the defendant, "Will, don't forget your revolver," and Will said, "What?" and he said, "Your old six shooter," and Will went upstairs and got his gun." They then went on to Charles Scadden's and while there the conversation with Stella Scadden took place. After leaving there they went to the home of one Recker, who also lived near by. While there they shot at the mark both with the pistol and with a rifle of Recker's. They remained there about three-quarters of an hour and with one Marsh returned in his stick wagon to the home of Charles Scadden. Upon reaching

there they got out of the vehicle; the defendant and the deceased started in the direction of the house, while Marsh remained to hitch his horse. While doing so he heard the defendant say to one Jesse Fulton, who was near by on the wood pile, "Rummy, or Bummy, you better move or I will move you," and saw the defendant place his hand upon his hip pocket. Marsh was at the time placing a blanket on his horse and did not see him get his pistol. Following quickly thereafter he heard the report of a pistol and heard someone say "You shot," and turning around he saw the boy Scadden lying upon the ground. Cross had gone up to the wood pile where Fulton was.

The father testified that at the time of the shooting he was in his house. His attention was called by his little boy to the fact that Mr. Marsh was in the yard or near by. He went to the window and saw his son Elmer coming by, with Cross about six or seven feet behind him but gaining on him, and when he got inside the gate, "he (Cross) drew his gun and willfully and deliberately shot him down." He then went out and found his son lying on the ground dead. At or about this time he saw Cross and told him he had shot and killed his boy, Cross said no he had not, that the deceased had fallen on a rock. The evidence discloses that Charles Scadden in going out of the house, in response to a question of his wife, said he did not know who was shot. Others also testified that he told them he did not know who was shot until after he had gone from the house and saw his boy lying upon the ground dead.

Cross, during that day, was seen by a number of persons who testified as to his condition. All of them testified that he was intoxicated, but they differ as to degree, some saying he was very drunk and a number of them saying that he staggered when walking. In speaking of his condition, Cross testified that "he remembered going to Mr. Recker's, but that is all he knew about that afternoon," that he did not know Elmer Scadden was shot and killed until that afternoon when told by Jesse Fulton on the public highway, what

time it was he could not say, but Fulton told him "John was shot or that he had shot John;" that this was the first he knew of it.

Recker, at whose house the defendant and deceased were before going with Marsh to Charles Scadden's, in speaking of the conduct of the defendant and the deceased while at his house, said "They were talking and laughing through each other, seemed to be good friends and talked like people when talking over a subject. They were talking rationally about cleaning up the graveyard, I think that is what we were talking about. It seemed like Cross would stop and hardly knew what he was talking; it seemed like he could talk on a subject but he would loose it; he hardly knew sometimes what he was talking about.

Charles Brunner and Jacob Dick both testified that about two o'clock on the day of the shooting they saw the defendant and the deceased in front of Mr. Recker's place. The deceased was not in the immediate presence of the defendant, but near by. They talked with Scadden and he told them "he had got the quart of whiskey and had given it to Cross and that he had him feeling pretty good." Both of these witnesses described Cross as being intoxicated.

The evidence introduced subject to the second, third and fourth exceptions was evidently offered for the purpose of showing motive in the defendant for the killing of the deceased. The evidence both for the State and for the defense discloses that the relations existing between the defendant and the deceased, so far as disclosed by their conduct, was that of the closest friends up to the very time that the pistol was discharged. A number of persons who saw them on that day, testified that they were talking and laughing together and appeared to be the best of friends. As we have said, it is not denied by the defense that the death of the deceased resulted from a wound inflictd by the discharge of a pistol at the time in the hands of the defendant, but it contends that it was accidental.

The alleged conversation between the witness Oscar Reynolds and the defendant occurred in the latter part of November or the first of December, several weeks prior to the day upon which the deceased met his death. It is, therefore, not admissible for the reasons assigned by us in admitting the conversation with Stella Scadden within an hour or so of the death of the deceased. By the offer of the State it is shown that the only person referred to or mentioned in this conversation was the mother of the deceased. It was she who was the object of the defendant's displeasure; it was she who the defendant said "was trying to get him into trouble and had said things about him with the view of getting him into trouble."

In this offer there is nothing to connect the deceased with the displeasure of the defendant or to indicate that it was he who was getting too familiar about defendant's place. The Court in its ruling did not allow the witness to testify to that part of the conversation in which reference was made to Bet Scadden, the only person specifically named therein, and his answer thereto was, "he said some people were getting too familiar around there or fast, something like that he said, and he was going to get on a hell of a drunk and shoot up the town." This alone went to the jury.

The succeeding question, to which exception was taken, was, "Do you know whether or not he was ever at Mr. Cross' home on occasions when Cross was absent from the house?" The family of the defendant consisted of himself, his wife and a little daughter six years old. With him away from home no one remained but the wife and child to receive the visits of the deceased, if any he made at such times to that home. It is, therefore, clear that the object of the State in offering this testimony was to show that the familiarity complained of was not to be understood by the jury as applying to the defendant, but to his wife, and it was for the purpose of injecting this fact into the minds of the jurors that this evidence was offered. The record contains no evidence of undue familiarity with the wife on the part

of the deceased, or that the defendant ever suspected or charged the deceased with such familiarity. In the answer of the witness there is nothing to indicate that the defendant had any reference to the wife or that the party referred to was too familiar with *her,* and certainly nothing to indicate that the deceased was the party to whom he referred.

This testimony here admitted is wholly conjectural, yet the purpose for which it was offered was obvious to the jury. It could not prove otherwise than prejudicial and hurtful to the defendant, and being misleading and irrelevant it should not have been admitted. The learned Court below in admitting it committed a reversible error. *Strange* v. *State* (Texas), 42 S. W. Rep. 551.

The fifth and sixth exceptions were waived by the defendant, and we find no objection to the ruling of the Court on the seventh exception, the witness was only explaining what he had a right to explain.

Charles Scadden testified that he saw, through the window of his house, his son and the defendant approaching, and that the defendant "drew his gun and wilfully and deliberately shot him (his son) down". When asked, he denied saying to either George Rudy or to Martin Newcomer, or in the presence of either of them, on the day of the shooting, at his home, that he did not know it was his boy that was shot until he went out of the house on the occasion of his death. And he also denied that he said to either Elmer Rudy of Julia Ervin, or in the presence of either of them, in the evening of the following day, at his home, that he believed that he, the defendant, did not intend to shoot Elmer.

George Rudy and Martin Newcomer, when thereafter upon the stand, testified that Charles Scadden said in their presence on the evening of the shooting at his home, that he did not know that it was his boy that was shot until he went out of the house on the occasion of his death; and Elmer Rudy and Julia Ervin both testified that in the evening of the following day they heard Charles Scadden say in their

presence that he did not believe Cross intended to shoot
Elmer.

In support of the credibility of the testimony of Charles
Scadden at the trial as to the facts in which he is contra-
dicted by George Rudy, Martin Newcomer, Elmer Rudy
and Julia Ervin—Isaac Long and George W. Fridinger were
permitted by the Court to give in evidence the testimony of
Charles Scadden given at the coroner's inquest on the morn-
ing of the day following the death of his son, corroborative
of Scadden's testimony as to such facts. It is the admission
of this testimony that forms the 8th, 9th, 10th, 11th, 12th,
13th and 14th bills of exceptions.

The general question presented by these exceptions has
been, upon a number of occasions, before this Court. *Cooke
v. Curtis,* 6 H. & J. 93; *Washington Fire Ins. Co.* v. *Davi-
son,* 30 Md. 104; *McAleer* v. *Horsey,* 35 Md. 441; *Maitland
v. Citizens' National Bank of Baltimore,* 40 Md. 540; *Bloom-
er* v. *State,* 48 Md. 521; *City Pass. Ry. Co.* v. *Knee,* 83 Md.
77; *Gill* v. *Stayler,* 93 Md. 453; *Lanasa* v. *State,* 109 Md.
602.

In the first of these, the case of *Cook* v. *Curtis*—an eject-
ment case—Dr. Kingsmore, on behalf of the defendant, stated
in a deposition that he attended Mrs. Rebecca Cook at the
birth of a child which he stated was born alive. Several
witnesses offered by the plaintiff testified that the child was
not born alive, and further testified that Dr. Kingsmore was
not present at the birth of any of Mrs. Cook's children. The
defense, to corroborate and sustain the credibility of Dr.
Kingsmore, but not to prove the disputed fact to which he
had testified, offered the testimony of a witness to whom Dr.
Kingsmore, two or three days after the alleged birth of the
child and before the date of the deposition, had told of the
facts and circumstances concerning the said child and its
birth as stated by him in his deposition. JUDGE BUCHANAN,
in delivering the opinion of the Court, said: "We perceive
no good reason why the evidence offered and rejected should

not have been received in corroboration of what was sworn
to in the deposition of Dr. Kingsmore, a sufficient founda-
tion for that corroborating testimony being laid by the plain-
tiff, in offering evidence that Kingsmore was not present at
the birth of any of Mrs. Cook's children, which was substan-
tially to impeach her credibility. *And where the credibility
of a witness is attacked by the opposite party his prior decla-
rations may be given in evidence to show his consistency."*

The case before us differs from the case of *Cook* v. *Curtis*
and the other cases cited in the mode by which the credibility
of the witnesses is assailed. In those cases the attack upon
the credibility of the witness was made by contradicting him
as to the facts sworn to by him. In this case the credibility
of the witness was assailed by showing that at other times
and places, prior to the time of his testifying at the trial of
the case, he had made statements inconsistent with his testi-
mony at the trial.

In our opinion, this difference in the mode of impeach-
ment should have no effect upon the application of the rules
as laid down in *Cook* v. *Curtis, supra,* as we find no sound
reason therefor.

As stated by JUDGE ALVEY in the case of *Maitland* v. *Citi-
zens' National Bank, supra*: "The rule recognized and applied
in these cases (the cases to which we have referred) would
seem to be an exception to the general principle which
excludes all mere hearsay evidence because *ex parte* and with-
out the sanction of an oath, but the evidence admitted under
it is not admitted to prove or disprove any fact involved in
the issue on trial, but simply to corroborate or support the
credibility of the witness who may be *in some manner*
impeached. It is a rule, however, not very generally recog-
nized in the Courts of England or of other States of this
country, and it should not be extended, but applied strictly.
The Legislature at its last session abrogated the rule entirely
as applied to the case of a party to the cause who may be
examined as a witness (Acts 1874, Chap. 385), but left it
in force as applicable to other witnesses."

The Act to which the Court referred is now section 3 of Article 35 of *Bagby's Code,* and is as follows: "Nor shall it be competent in any case of any party to the cause who has been examined therein as a witness to corroborate his testimony when impeached by proof of his own declarations or statements to third persons out of the presence and hearing of the adverse party."

It will be seen that by this statute, only parties to the cause, who have been examined as witnesses, are forbidden or prohibited from corroborating their testimony when impeached by proof of their own declarations or statements made to third persons.

JUDGE ALVEY, in saying that "such evidence is received to corroborate or support the credibility of the witness who may be in some manner impeached," indicates that the application of this rule was not dependent upon the mode of impeachment found in these cases. The language used by him is broad enough to cover both modes of impeachment.

In one of the later cases (*City Pass. Ry. Co.* v. *Knee,* 83 Md. 79), the Court said that evidence of the character here offered is admitted "upon the theory that the witness, having been impeached by evidence showing that he has testified under corrupt motives, or has fabricated his testimony to meet the exigencies of the case, the fact that he uttered the same statement, shortly after the transaction, and before the motive to fabricate existed, tends to support not only his integrity, but also the accuracy of his recollection." To bring a case within this exception it must appear that the conversation occurred soon after the transaction, is consistent with the statements made on oath, and contains such fact or facts pertinent to the issues involved as reasonably furnish to the jury some test of the witness' integrity and accuracy of recollection. And this is the rule that obtains in Maryland. *Lanasa* v. *State,* 109 Md. 602.

The corroborative testimony here offered is that of two witnesses who were present at the coroner's inquest on the

morning following the day of the shooting and heard Scadden's testimony, under oath, at such inquest, in which they gave the statement made by Scadden on that occasion, in relating the facts of the shooting of his son which was substantially the same as made by him on the day of the trial. In our opinion the corroborated testimony of these witnesses as to a statement of Scadden made under oath following so closely the transaction concerning which he testified at the trial, and at a time when such transaction was fresh upon his mind, should be admitted to support his integrity as well the accuracy of his recollection.

The record contains a charge that was said to have been delivered by the learned Court below to the petit jurors of the term of the Court at which the defendant was tried. This, however, is not properly before us and we cannot consider it. From what we have said as to the rulings of the Court on the 2nd, 3rd and 4th exceptions the judgment of the Court below will be reversed and a new trial awarded.

*Judgment reversed and a new trial awarded.*