## JOSEPH DUFFY v. STATE OF MARYLAND.

*Criminal Law—Evidence—Experiment in Court Room—Cross-examination of Defendant—Charge of Other Crime—Polling of Jury.*

The permitting of an experiment in the court room, such as "holding a watch on" a witness to determine his ability to estimate time, is within the discretion of the trial court, and its action in this regard will not be reviewed in the absence of a palpable abuse of discretion.                              p. 460

On a prosecution for robbery in a "near beer" saloon, a question asked of a witness for the State as to whether he could get whiskey in the saloon was properly excluded as irrelevant.

p. 461

That the court allowed the detective who arrested appellant and his codefendant, while they were together, more than a month after the crime, to be asked if, when arrested, they explained why they were together, to which he answered that

they merely denied their guilt, was not reversible error, in spite of the remote materiality of the questions.          pp. 461, 462

A question asked of the same witness, whether he made any investigation as to a boy, not connected with the crime, who was with defendants when they were arrested, was properly excluded as irrelevant.                                    p. 462

One accused of crime, testifying in his own behalf, may not be asked on cross-examination whether he has not been charged with some other crime, of which he has never been convicted.

pp. 465-468

While, ordinarily, error in overruling an objection to a question is not cause for reversal where the question is not answered, or where the answer is negative or favorable to the appellant, there may be cases in which such an error may be prejudicial, as where the erroneous examination is so persistent and extended, or the question is so framed, as to amount to an accusation which is likely to create a prejudice in the minds of the jurors against the accused.                              p. 469

That the attorney for the State persisted in asking defendant whether he had not once been charged with larceny and then ordered to leave the city, even after the attorney was informed by the court that such questions were inadmissible unless there had been a conviction or an agreement by defendant to leave the city in order to secure a dismissal of the charge, constituted reversible error, as amounting to an assertion that there had been such an agreement or a conviction, which might have prejudiced the jury.                              pp. 469, 470

The court exercised a valid discretion in allowing defendant to be asked, on cross-examination, whether he had not at one time been known under another name, the fact that he had gone under a false name reflecting to some extent on his veracity, as well as serving to establish his identity.          p. 470

On a prosecution under four separate indictments, defendant's request that the jury be polled in each case was properly complied with by the clerk in asking each juror, after he had heard the foreman announce the verdict in each case, whether the verdict of the foreman in each case was his verdict.    p. 471

That the defendant, in a prosecution for a felony, was locked up in another room, when the court repeated to the jury instructions, which it had previously given them in his presence, as to the form of the verdict, was cause for reversal, although defendant's counsel were in the court room at the time, and no injury to defendant was shown.                          pp. 472-477

*Decided November 12th, 1926.*

Appeal from the Criminal Court of Baltimore City (DUFFY, J.).

Criminal proceeding against Joseph Duffy and another for robbery. From a judgment of conviction, defendant Duffy appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Harry W. Nice* and *Lindsay C. Spencer,* with whom was *Max Sokol* on the brief, for the appellant.

*John Hubner Rice, Assistant Attorney General,* with whom were *Thomas H. Robinson, Attorney General,* and *Herbert R. O'Conor, State's Attorney for Baltimore City,* on the brief, for the State.

OFFUTT, J., delivered the opinion of the Court.

At half past ten o'clock at night on August 28th, 1925, four men were gathered in a near beer saloon conducted by Harry Adams at 116 East Pratt Street in Baltimore City. It had two rooms, a bar-room and a back room adjacent to it. The bar room was dimly lighted by a single gas jet, the back room was lighted by a "big globe," and customers entered the saloon by a side door, the front door having been kept closed for about two years. One of the three men in the bar-room, Thomas Geraghty, had a glass of whiskey on the bar before him, Dougherty, the bartender, was behind the bar, and Morris Finn, the third man, was at the bar but not drinking.

They were discussing the not wholly unseasonable topic of revenue officers and their ways, and speculating upon the probability of a visit from them, when suddenly two men 'entered the room with drawn pistols. The newcomers brought the fourth man, Coady, from the back room, and lined the four men up against the wall in the bar-room, robbed them of their cash and valuables, and escaped. As soon as they had gone the four men at once went out to notify the police, and fortunately found two policemen "standing right outside on the corner." They were taken to detective headquarters and shown a number of pictures. Dougherty and Finn identified a picture of James Cleary as one of the robbers, and subsequently, on October 2nd, 1925, the Philadelphia police, at the request of the Baltimore authorities, arrested him in Philadelphia. At the time of his arrest Cleary was in an automobile with Joseph Duffy, the appellant, and an Italian boy, John Caput, who were also arrested at the same time, not on any charge then made against them, but because they were with Cleary, and the three were held for the Baltimore police. Subsequently Cleary and Duffy were brought to Baltimore, where they were jointly indicted in four several cases for the robbery of the four men to whom we have referred. On those indictments they were tried and convicted, and upon their conviction Cleary was sentenced to ten years in the Maryland penitentiary in each case, and Duffy to eight years in each case, the sentences of each defendant to run concurrently. From these judgments Duffy appealed. After the sentence Duffy filed in each case a motion to strike out the verdict, sentence and judgment therein, which was overruled, and he also took an appeal in each case from the order overruling such motion. These are the eight appeals brought up by the record in this case.

The legal questions raised by the appeal are presented by eleven exceptions dealing with questions of evidence, and by the order of the court passed in each case overruling the motion to strike out the verdict, judgment and sentence therein.

As we have stated, there were present at the robbery only six men, the two robbers and their four victims.   Of these four men, Dougherty, the bar-keeper, positively identified Duffy as one of the robbers.   Finn said that he "honestly" did not think that Duffy was there at all; Geragthy identified Cleary, but said he "could not tell" who the other man was, and Coady also identified Cleary, but said he would not be able to identify the other man.

Of these four men, Dougherty, who had been pardoned after he had served twelve and a half years of a fifteen-year sentence for "murder," was first called.   He said that the men were in the room about fifteen minutes, and that while he did not remember their "head-gear," he did remember their faces.   He further said that after the robbery he had gone to police headquarters, where he was shown three or four photographs, among which was one of Cleary, which he identified.   Another witness had already described the bar-room as being forty feet long, with a small light "in the bar," and counsel for the appellant, for the purpose of discrediting Dougherty's testimony, by showing that he did not have sufficient time to positively identify Duffy in the dimly lighted room, offered to test his ability to gauge time by "holding a watch on" him.   The court refused to permit that, and that ruling is the subject of the first and second exceptions. Experiments of the same general character as that proposed are frequently permitted, and may at times be helpful in testing the ability of a witness to estimate time or distance, and may properly be admitted for that purpose, but whether they shall or shall not be permitted is manifestly within the discretion of the trial court, and in the absence of evidence of a palpable abuse of that discretion, it will not be reviewed. *Wigmore on Evidence,* pars. 460, 994, 1152.   Finding no such evidence in this record, there was in our opinion no error in these rulings.

Morris Finn, a witness for the State, had testified that, when the robbery occurred, Geragthy had a glass of whiskey in front of him, but said that he had never himself "bought

anything down there." He was then asked by counsel for the appellant, "But you could get all you wanted, couldn't you ?" An objection to that question was sustained and that ruling is the subject of the third exception. It was wholly immaterial and irrelevant whether the proprietors of the saloon had sufficient confidence in Finn's discretion to sell or give him intoxicating liquor, and we find no error in this ruling.

Detective Mahaffey, of the Philadelphia police force, testified that he arrested Cleary, Duffy, and John Caput, together in the same automobile. He was then asked this question: "Outside of denying that they had committed this crime, they did not give you any explanation of how they happened to be together or anything else, did they ?" An objection to that question was overruled, and the witness answered: "I didn't ask them why they were together." He was then asked, "But they didn't give you any explanation as to that ?" An objection to that question was also overruled, and the witness answered: "They said they did not do it, and that was all." These rulings are the subject of the fourth and fifth exceptions. The form of these questions was highly objectionable, but as no point was made of that in the trial court it will not be considered here. Aside from that objection, these rulings appear to be free at least from reversible error. It is true that the materiality of the questions was rather remote, because no definite inference of Duffy's guilt or innocence of the crime of which he was convicted could be drawn from the mere fact that he was in Cleary's company more than a month after the crime was committed, and the fact that Duffy gave no explanation of that association to Mahaffey when he was arrested proved nothing. But the fact was that he was with Cleary at that time, and when Mahaffey was examined there was nothing in the record to show why he was with him, and Mahaffey's answers certainly could not have injured the appellant, because he only stated what the jury in the absence of any evidence on the point must have inferred. That is, if no explanation of the fact that Duffy and Cleary were together had

been given, then, so far as the jury were concerned, it would have been unexplained. The appellant contends the defendant had the right to keep silence, and that no inference could be drawn from the fact that he did so. But these questions do not challenge that right; they only inquired whether in fact he did keep silent.

Following the questions referred to in the preceding exceptions, Mahaffey was asked: "Did you make any investigation as to this boy, Caput?" An objection to that question was sustained, and that ruling is the subject of the sixth exception. This question was wholly irrelevant. No one had connected Caput in any way with the crime for which the appellant was convicted, and whether Mahaffey had or had not investigated him was collateral to any issue in the case. The appellant contends that he had the right to show the reputation of Caput, if it was good, to neutralize any inference which might be drawn from appellant's association with Cleary, whose reputation was thought to be bad. If the general reputation of Caput had been a relevant fact in the case, which it was not, there is nothing in the record to indicate that appellant proposed to show what it was, and the question itself bears no inherent *indicia* of any such intent.

Duffy's defense was an *alibi*. He testified that he was a waiter employed in an Atlantic City hotel, and that he was in Atlantic City at the time the robbery occurred. He was corroborated by Mrs. Katherine Travis, wife of a Philadelphia detective, who said that she and her husband, who knew him quite well, met Duffy in Cohen's drug store in Atlantic City, after eight o'clock P. M. on Friday, August 28th, 1925; David Harris, proprietor of the restaurant where Duffy worked, who said that he was at work there at ten thirty o'clock on the same evening; George Stoess, who kept the hotel in Atlantic City where Duffy boarded, who testified that he saw him there in base ball clothes as late as six o'clock on the same evening; Charles Cohen, who keeps a drug store in Atlantic City, who said that on the same evening, some time after eight o'clock, he saw Duffy

with his wife in his store with the Travises, and Mrs. Marie
Duffy, his wife, who testified that her husband was not away
from her at any time from the time they came to Atlantic
City until he was arrested, and that on that occasion he had
gone to Philadelphia with Caput, in his, Caput's automobile,
to get a heavy overcoat for himself and a dress for his wife
which were being repaired in that city. Duffy testified in
chief that, on the day he was arrested, he met at Atlantic
City Caput, who ran a grocery store in Philadelphia, whom
he knew, and Cleary, whom he did not know, until intro-
duced by Caput, and that when he found they were going
to Philadelphia he decided to go with them to get his coat
and his wife's dress. On his cross examination, after testi-
fying that he had gone to Atlantic City in May, 1925, to get
a "job" as a waiter, that he had been a waiter in Phila-
delphia and some years before had had a saloon in Detroit,
and as to his earnings at Atlantic City, he was asked this
question: "On August 17th, 1918, weren't you picked up
down in Atlantic City, and charged with the larceny of an
automobile, and on August 24th, 1918, was there a hearing
before Inspector Malseed, and were you then ordered to,
leave Atlantic City"? The defendant objected to that ques-
tion, and the court then said: "I can't admit that, I can't
admit that unless there was a conviction or unless there was
an agreement to that effect. If you want to prove an agree-
ment between him and the committing magistrate, between
the committing magistrate and this man, that the charge
would be dismissed if he would leave the city, I will admit
that fact." The State then asked, "Now why did you leave
Atlantic City in 1918, after the hearing before Inspector
Malseed?" The Court then of its own motion suggested this:
"In the first place ask him whether or not there was any
such hearing?" and then the State asked him: "Well, there
was a hearing down there, wasn't it? Isn't that so?" An
objection to that question was overruled and the witness
answered: "It was no larceny of an automobile." The
State then asked, "Didn't you agree with Inspector Malseed

to leave town there rather than face a hearing?" An objection to that question was also overruled, and the witness answered, "I did not." These rulings are the subject of the seventh and eighth exceptions. Counsel for the State, in support of these rulings in their brief, made this statement: "The questions for consideration found in the seventh, eighth and tenth bills of exceptions all relate to the admission of evidence as to former convictions offered for the purpose of attacking the credibility of witnesses produced by the defense." That statement, however, is wholly unsupported by the record in the case; in fact it may be inferred from the record that there was no conviction and that counsel for the State were aware of that fact. Because after the rulings involved in these exceptions, and after counsel had examined the defendant as to other matters, the following occurred in the course of his cross examination:

"Now, on October the eighteenth, 1917, you were charged with the larceny of an automobile— (By Mr. Nice) Now, don't you answer that, and Mr. Moser, unless there was a conviction, don't you ask him that. (By the Court) I can't tell what the question is unless it is completed. Of course, Mr. Moser, it is not proper for you to make a statement as to a charge that was merely made against him and in which there was no conviction. If you know that there was no conviction tell us. He says there was not. If you have got nothing to prove that there was, then it should not be asked. (By Mr. Moser) No, sir. All we have is just this. (By Mr. Nice) They have got a lot of stuff that is sent around the country by the different police departments, if your Honor please, and there is no conviction and you know it, Mr. Moser, that there is no conviction against this man. (By the Court) Now, ask him a question that was not predicated on the fact that a charge was made against him of stealing an automobile. Question by Mr. Moser: Q. Well, now did you or did you not steal an automobile in Philadelphia on or about October 18th,

1917? (By Mr. Nice) Now we object to that question.
(By the Court) Now look here. You will get a reversal
on you in this case if you keep on asking those questions.
(By Mr. Moser) I think that particular question is a proper
one. (By the Court) No, it is not a proper question to
ask. You ought to ask him if he was convicted of stealing
an automobile in Philadelphia. Or, if he was not con-
victed of stealing an automobile in Philadelphia. Convicted,
mind. The fact that he was charged with stealing is not
admissible at all. A number of cases decide that. There
is a line of them."

The only apparent purpose of the questions was to place
before the jury the insinuation that the defendant had been
charged before a police inspector with the larceny of an
automobile, although the court had warned counsel that such
evidence was improper. The question then is, Was it per-
missible for the State on the cross-examination of the de-
fendant to ask him whether he had been charged before a
police officer with a crime of which he had not been convicted,
and whether he had agreed to "leave town" rather than face a
hearing on that charge? There are few legal topics in
which there is so wide a variety and so sharp a conflict in
the decisions of American courts, as the limits to which
cross-examination may be pushed in searching out and ex-
ploiting every incident in the past life of a defendant who
testifies in his own behalf in a criminal prosecution. Wig-
more in referring to that conflict says: "The state of the law
upon the foregoing topics illustrates the truth (not as often
judicially appreciated as it ought to be) that there are half
a hundred independent jurisdictions within our boundaries,
and that it is impossible to make use of all the rulings as
though they were valid precedents for every jurisdiction.
The shuttlecock citation of decisions, backward and forward,
in and out of their proper jurisdictions, has done much to
unsettle and to confuse the law. The greatest judicial serv-
ice that can be rendered today is to keep the line of prece-
dents clear and inflexible in each jurisdiction. In general,

the state of the various laws on the foregoing topics may be thus summarized: (1) Extrinsic testimony to particular acts is universally conceded to be inadmissible. Sporadic rulings of admission have usually been due to some other principle misapplied (2) For cross-examination, the rule of the trial court's discretion is (in name, at least) the most widely adopted. The discretion, however, is in practice very often interfered with, to the detriment of the law's certainty. The contrast, nevertheless, is clear between this and the rule of absolute prohibition, on the one hand (which obtains in perhaps a dozen jurisdictions) and the rule of absolute license, on the other hand (which is in this country nowhere conceded). (3) The privilege against disgracing answers has in almost all jurisdictions disappeared. Its service, so far as it was useful, is better rendered by the rule of judicial discretion. (4) Convictions of crime are everywhere conceded to be admissible. The tendency is to a simplicity of the rule defining the kinds of crime (i. e. either all crimes, or felonies only) instead of the common-law subleties," and he illustrates that comment by a number of cases decided by the courts of the several states.

*Underhill on Criminal Evid.,* par. 61, states that one accused of crime testifying in his own behalf may be asked on cross-examination concerning a "previous arrest, or indictment, or his conviction of a felony," but not only are the cases cited in support of that conclusion in conflict, but Jones, in his work on Evidence, states that "on principle it would seem that such evidence should be excluded, and by the weight of authority it is held inadmissible." *Jones on Evid.,* par. 838. And in 28 *R. C. L.* 622, it is said that "in at least one jurisdiction it has been held that he may be interrogated as to his prior arrest," and the conclusion of the author of that article is that "in any view it would seem that the cross-examination as to collateral matters should be limited to an effort to discredit the defendant as a witness, and the limit is exceeded when the questions are not useful for that purpose, and the necessary result, and perhaps the purpose, is merely

to prejudice the jury against the defendant." And, in commenting on the "one jurisdiction" which allows such questions, Jones says, "If any illustration were needed of the injustice of permitting such questions, it is furnished from Texas, where the Court of Criminal Appeals allows it." *Jones on Evid.*, par. 838. And in 40 *Cyc.* 2603 it is said: "It is not permissible for a party to bring out the fact that a witness has been accused of or arrested or indicted for a crime of which he is not shown to have been convicted, for the purpose of affecting his credibility."

In this state, in *Smith v. State*, 64 Md. 15, it was held that a witness might be asked on cross-examination whether he had ever been "confined in the Baltimore City Jail." The trial court permitted the question, but informed the witness that she was not obliged to answer it, and that ruling was affirmed on appeal. But in *McLaughlin v. Mencke,* 80 Md. 86, the question in the *Smith* case, *supra,* was treated as equivalent to asking the witness if she had not been convicted of a crime, because the court said of that case: "But it is contended that conceding (and this concession is necessary since the ruling in *Smith v. State*) that even if the appellee had the right to show the witness had been convicted, it was error not to produce the best evidence thereof, viz., the record of conviction. In *Guy v. State,* 90 Md. 29, it was said that an accused person testifying in his own behalf in a criminal prosecution is subject to cross-examination, "as other witnesses," and that he may be examined as to any matter "pertinent to the issue on trial." In *Bonaparte v. Thayer,* 95 Md. 559, there was an attempt to impeach the credibility of a witness by proof that he had been indicted in the criminal court, but not convicted, and in dealing with that question this Court said: "It is unquestionably a misfortune for a man to be indicted, but that fact alone is not always equivalent to guilt. An entirely innocent person may be the victim, and it would be a gross injustice to permit what is only a charge of misconduct to be used to the prejudice, if not the ruin, of his good character. Especially would this be so, in a case

like this, where the charge was practically abandoned by the State. In *McLaughlin v. Mencke,* 80 Md. 88, the Court said that anything that would throw light on the credibility of the witness may be offered. A mere indictment cannot do this, from the fact that it cannot be questioned that a mere charge, unsustained by proof, does not have such an effect." That statement of the rule was affirmed in *Kremen v. Rubin,* 139 Md. 692, and in *McAllister v. State,* 140 Md. 650, this Court through Judge Adkins said: "But it has never been held in this state, and is not likely to be, that the accused who volunteers to meet the charge against him by testifying in his own behalf as to that charge can be compelled to testify on cross-examination as to another crime in no way connected with the one for which he is being tried, and which the State would not be permitted to prove by other witnesses."

Applying the rule which, upon the authority of these cases, is in force in this state, that one accused of crime, testifying in his own behalf, may not be asked on cross-examination whether he had not been previously charged with some other crime of which he had never been convicted, to the two questions involved in the seventh and eighth exceptions, they were unquestionably improper and they should not have been allowed. It is argued, however, that the answers to these two questions were of such a "negative and harmless character" that the defendant could not have been injured. In respect to that question the case is strikingly analogous to that of *McAllister v. State, supra,* in which this Court said: "It is urged that the answer of the witness prevented the questions from being harmful. With this we cannot agree. The questions, extending over six or seven pages of the record, with minute details (*Underhill on Criminal Evidence* [2nd Ed.], sec. 61), in themselves imputed to the witness the crime of forgery and imported a knowledge by the state's attorney of the truth of the charge. While the witness denied and sought to evade, in his answers to some of these questions, yet, taken as a whole, his answers tended to prove that he had been concerned in the forgery of certain checks at least to the extent of uttering one of them."

Ordinarily, error in overruling an objection to a question is not reversible where the question is not answered, or where the answer is negative or favorable to the appellant (17 *C. J.* 308), but there may be cases in which such an error may be prejudicial, as where the erroneous examination is so persistent and extended, or the question is so framed, as to amount to an accusation which is likely to create a prejudice in the minds of the jurors against the accused, as in the case of *McAllister v. State, supra.* In *Allred v. State,* 126 Ga. 537, it was held prejudicial error to permit a witness to be asked over objection "if he had ever bought spurious money," where the statute prohibited any inquiry into specific offenses in the cross-examination of witnesses except to probe the extent of the witness' knowledge, even though he declined to answer the question. And in *People v. Hamilton,* 268 Ill. 400, the state's attorney persisted in an improper examination, ending in the question, "Were you not in jail in Geneva during that time?" An objection to that question was sustained, but the appellate court, in considering whether the accused was injured by it, said: "No part of this examination was proper cross-examination. It had no reference to any subject inquired about in the examination in chief, and could have no possible connection with the commission of the alleged offense. Every objection made to the questions asked in reference to this subject should have been sustained. A sufficient number were sustained to indicate to the state's attorney that the examination was improper, but he persisted until he finally arrived at the desired goal, and succeeded in conveying the intimation to the jury that Hamilton had been at some time and for some reason confined in the jail at Geneva. This conduct of the state's attorney was improper, and such a practice will not be tolerated. While an objection was sustained to the last question asked, it cannot be said that no harm was done." Later, in referring to the effect of other objectionable questions asked in the cross-examination of the same witness, the court said: "To each of these questions an objection was sustained, but the mere ask-

ing of such questions was prejudicial. There is no possible theory upon which it can be claimed that such an examination was competent, and it seems incredible that a state's attorney should so far forget the duty devolving upon him in a criminal prosecution as to adopt such methods to attempt to discredit a defendant and to endeavor to prejudice the jury against him." Returning to the immediate question, while we do not go as far as the case last cited, we are unable to say that the appellant was not injured by these rulings involved in the seventh and eighth exceptions. The action of the attorney for the State in asking these questions, after he had been informed that they were inadmissible unless there had been a conviction or an agreement on the part of the defendant to "leave Atlantic City," amounted to an assertion that there had been such an agreement or conviction (wholly unfounded so far as the record discloses), and taken in connection with his persistence in asking similar questions against the instructions of the court, may well have prejudiced the jury against the defendant.

The traverser was also asked whether he had not at one time been known under the name of Joseph Harris. An objection to that question was overruled, and that ruling is the subject of the ninth exception. The witness was under cross-examination, and the fact that he had gone under a false name may have reflected to some extent upon his veracity and was admissible for that purpose, as well as to establish his actual identity, and the court exercised a valid discretion in permitting the question.

The tenth exception is not involved in this appeal, and the eleventh is without merit and was not pressed in this court, and these exceptions need not therefore be considered.

This brings us to the motion to strike out the verdict, judgment and sentence in each of the cases against the appellant. The motion as filed was based upon four propositions, (1) that the court "instructed the jury and directed them as to their verdict out of the presence of the defendant and while the defendant was under the custody of the sheriff

of Baltimore City, and held in the lock-up located in the basement of the court house of Baltimore City," (2) that the jury was improperly polled, (3) that the clerk of the court without proper authority "changed the verdict" after it had been recorded, and (4) because a certain "Claire McCabe" had in his dying statement declared that he and another had committed the crime of which Duffy and Cleary were convicted, and that Duffy had nothing to do with it. The third and fourth grounds were by stipulation of counsel abandoned in the lower court, and need not therefore be considered on these appeals.

The question presented by the second objection is free from difficulty. When the jury had agreed upon a verdict, they were brought into the court room, and the foreman, reading from a paper or memorandum, announced the verdict in each case. The defendant then asked that the jury be polled in each case. The clerk thereupon "proceeded to ask each juror his verdict on the various indictments." After he had taken the verdict of the foreman, under the instruction of the court, in polling the other jurors, in each case, he used this formula: "You have heard the verdict of your foreman; is his verdict your verdict?" It is not clear what the objection to this procedure is. It is not said that each juror was not polled in each case, and the form used has been familiar in the practice and procedure in the courts of this state for many years, and appears to be generally recognized as sufficient. 16 C. J. 1099. The defendant contends that "the court erred in directing the clerk to ask each member of the jury whether the verdict of the foreman was that of the juror so questioned, when, as a matter of fact, the foreman had pronounced not one verdict, but four separate verdicts." But if each juror had heard the foreman announce the verdict of the jury in each of the four cases, and was asked whether the verdict of the foreman in each case was his verdict, and the record appears to establish that, the force of that objection is not apparent. Without further reference to it, it is sufficient to say that we find no error in that procedure.

The last question is whether the lower court erred in instructing the jury as to their verdict out of the presence of the defendant, and the facts in reference to that are these. It will be remembered that Duffy and Cleary were jointly indicted in four cases. In three of the cases, those in which they were respectively charged with robbing Finn, Geragthy, and Coady, the indictments contained four counts, one for assault and robbery, one for assault with intent to rob, one for common assault, and one for receiving stolen goods. In the other case in which they were charged with assaulting with intent to rob Dougherty, the indictment contained two counts, one for assault with intent to rob, and one for common assault. These cases were all tried concurrently in the Criminal Court of Baltimore City. At the conclusion of the trial, but before the jury retired, they were instructed by the presiding judge as to the form of their verdicts in these several cases. Some time after they had retired, and when the defendant Duffy was locked up in another room in the court house, in the custody of the sheriff, the foreman sent word to the court that the jury wished further instruction as to the form of their verdict. The judge then sent for them, and they were brought into the court room, the foreman taking a position near the bench, and the other jurors taking their seats in the jury box. The court then, in a voice audible to all in the court room, repeated the instructions as to their verdict which he had previously given them, and the foreman took notes on a piece of paper while he was speaking. Although counsel for the traversers were present, to quote from the certificate of the court, "All the above proceedings took place while the traversers were still locked up in the basement."

The appellant contends that in thus instructing the jury as to their verdict out of the presence of the traverser the court committed reversible error, even though injury resulting from that procedure is not shown. The State, however, contends, if we understand its position, that while the rule at common law was that the accused must always be present

in person, that rule was merely a custom, to be followed where possible, but that a violation of it would not be reversible error unless injury were shown. These conflicting contentions present the issue before us. The general rule, as stated in *Bishop on Crim. Proc.* 271, is that: "Except as already appearing, the doctrine is that in felony or treason the accused must be present at every material stage in the trial, as, the swearing of the witnesses and the giving in of the evidence, the charge to the jury, special instructions during its deliberations, the rendition of the verdict,—else there can be no valid judgment against him." Wharton, referring to the same rule, says: "It is clear that the defendant must be present at the charge of the court. Even where, after the jury had retired to deliberate upon their verdict, they returned into court and asked certain questions of the court as to what had been the evidence on particular points, to which the court replied, giving the information requested in the defendant's absence, it was held that this was error, for which the conviction must be reversed, and this though defendant's counsel were present." *Wharton, Crim. Proc.,* par. 1483. And in *Corpus Juris,* the author of the article on Criminal Law deduces from a number of cases cited in a footnote the following statement of the law: "By express constitutional or statutory provision in many states, and at common law in the absence of a statute, it is essential to a valid trial and conviction on a charge of felony that defendant shall be personally present. not only when he is arraigned, but at every subsequent stage of the trial, unless he may and does waive his right to be present. * * * Defendant should also be present during the argument of counsel, when the case is finally submitted to the jury, when the court charges the jury and when they are re-charged or given additional instructions after retirement." 16 *C. J.* 813, 814, 815. In *Maurer v. People,* 43 N. Y. 1, where there was a statute which provided that no person indicted for a felony could be tried unless he were present at the trial, the court, referring to an objection that

the jury had been called back after they had retired, and in the absence of the accused asked certain questions as to evidence given in the case, which the court answered, said: "Any instruction or information given by the court to jury, having a tendency to influence the verdict, is, within the statute, a proceeding upon the trial, and this is prohibited unless the accused be present. A trial, wholly or in part, conducted in his absence is illegal, and he has an absolute right to a reversal of the judgment, and to a new trial." In *Roberts v. State,* 111 Ind. 340, the court recalled a jury and in the absence of the accused corrected an error in the charge which he had previously given them. In dealing with an objection to that procedure the court said: "Some of the states have statutes similar to ours, but, whether such statutes exist or not, the holdings have generally been that the trial in a felony case cannot proceed, to any substantial extent, in the absence and without the consent of the accused, and that to so proceed with the trial in his absence is an error for which the judgment must be reversed." In *State v. Shutzler,* 82 Wash. 367, the jury before whom accused had been tried for larceny, and who had retired to deliberate on their verdict, were brought into court to be discharged, when the court was informed that they stood eleven to one. The judge, in the absence of the accused, then suggested to the jury that it would be proper for the one juror to consider whether or not he might be mistaken in his views, and requested them to return to the jury room for further deliberation, to carefully consider the evidence and if possible to agree on a verdict.

In disposing of an objection to the action of the trial court, the Supreme Court of Washington, after referring to constitutional and statutory provisions in force in that state requiring the presence of the accused in criminal prosecutions, said: "These are rights that pertain to the accused at every stage of the trial when his substantial rights may be affected—the giving to the jury special instructions during the period of their deliberations being no exception—and

any denial of the right without the fault of the accused is conclusively presumed to be prejudicial. * * * Since it is the right of the accused to be present at every stage of the trial when his substantial rights may be affected, it is no answer to say that in the particular proceeding nothing was done which might not lawfully have been done had he been personally present." See also cases collected in note 41, 16 C. J. 815.

The precise question does not appear to have arisen in this state, and is, to some extent, one of first impression, although there are in several cases expressions which are not without force in determining it. In *State v. Glenn,* 54 Md. 572, and *Danner v. State,* 89 Md. 225, it was held that article 5, Declaration of Rights, which declares that the people of this state are "entitled to the common law of England, and the trial by jury, according to the course of that law" applies to criminal prosecutions, and as we have pointed out, at common law, in all criminal prosecutions for felonies, such as those charged in the indictments in these cases, there could be no valid trial or judgment unless the accused were present at every stage of the trial. In *Wheeler v. State,* 42 Md. 563, upon which the State mainly relies, it was held that that privilege was not violated by the act of the trial court in sending to the jury room at the request of the jury a statement of law. But in that case the statement was made and the communication from the jury was received in open court, presumably in the presence of counsel for both sides, and in the presence of the accused, for his counsel stated to the court that he, the accused, desired the jury to be instructed in accordance with a prayer which was then read to the court. There was no suggestion that the instruction given the jury was not known to the traverser before it was sent, or that it was not a correct statement of the law, and the question before us was not referred to at all. And the offense for which the accused was tried in that case was not a felony, but a misdemeanor, and in *State v. Glenn, supra,* it was held that the declaratory principles, such as that quoted, found

in the Bill of Rights, were not applicable in all cases where an offender might be imprisoned or condemned, but that certain minor and statutory police offences, even though punishable by imprisonment, might be summarily prosecuted without reference to them. And what was said by the Court in *Wheeler v. State* in reference to a minor misdemeanor is therefore not applicable to the question before us, and in *Dutton v. State,* 123 Md. 389, it was held that under article 5 of the Declaration of Rights quoted above, the right of a prisoner on trial for a misdemeanor, punishable by death, to be present during the taking of the testimony against him, was absolute and could not be waived by counsel.

As we have stated, these cases are not sufficiently in point to control the question before us, but upon the general weight of authority, to preserve the integrity of the constitutional provisions to which we have referred, in our opinion, it would be unsafe to sanction the procedure followed in this case. It is true that the court certifies that the instructions, given in the absence of the prisoner, were the same as those given in his presence, but it also appears that the jury did not understand the instructions given in his presence, or they would not have asked for further instructions. What those instructions were, or what was written on the memorandum which guided the foreman in announcing the verdicts, does not appear in the record. It may be that it was a mere form of verdict and that it did not injure the defendant, but in dealing with an absolute constitutional right, the citizen ought not to be at the mercy of speculation as to whether the violation of it did or did not injure him. Since the jury did not understand the instructions as first given, it may have been that the prisoner, if present, when they were instructed a second time, would have asked that they be made clearer, or he may have objected to their form. They covered fourteen separate counts contained in four indictments, and they related, so far as he was concerned, to the most vital thing in the case, the verdict of the jury. If we held that under such circumstances he had no right

to be present, it is not easy to say under what circumstances his presence would be essential.

After careful consideration of the question and the authorities, in our opinion, the instruction of the jury as to the form of their verdict was a part of the trial, and in giving it during the involuntary absence of the prisoner, while he was in custody of the police, the court erred, and injury must be attributed to that error.

For these reasons the judgment appealed from will be reversed and the case remanded for a new trial.

*Judgment reversed and case remanded for a new trial.*

URNER, J., dissents.

BOND, C. J., dissents from so much of the opinion as deals with the motion to strike out the verdict, judgment and sentence.