### KNOWLES *v.* STATE

[No. 124, October Term, 1948.]

*Decided March 31, 1949.*

The cause was argued before DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Jacob D. Hornstein,* with whom was *Maurice T. Siegel* on the brief, for the appellant.

*Robert E. Clapp, Jr.,* Special Assistant Attorney General, with whom were *Hall Hammond,* Attorney General, *Harrison L. Winter,* Assistant Attorney General, and *J. Bernard Well,* State's Attorney, of Baltimore City, and *J. Harold Grady,* Assistant State's Attorney, on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal, taken in *forma pauperis,* Code, 1947 Supp., Art. 5, sec. 88A, from a conviction, after trial before the court without a jury, of murder in the first degree and sentence to death. At the argument and in his brief, and apparently at the trial, appellant did not deny the killing—or the murder—but only the premeditation necessary to constitute murder in the first degree. On Sunday afternoon, June 13, 1948, a little after six o'clock, near the Columbus monument in Druid Hill park, he killed Ruby Davis by stabbing her 25 times with a knife that he had in his pocket. He was 26, she was 22. He had known her for six years. He says she had lived with him in New York for about two years. During the war,

and afterwards, he was in the Merchant Marine. He and the girl had planned to be married. He says he from time to time gave her and her mother money, and made deposits to joint account in her name and his, in anticipation of their marriage, but when he returned from a voyage she had spent the money and he was in need. A few weeks before the killing, he says, he came from New York to Baltimore to be married and also to get some money from her. On Sunday afternoon he met her at a moving picture theatre, but she would not give him money enough for them to go in; they got on a bus and went to Mount Royal Station, sat down a while, got on another bus and went to Druid Hill Park, and walked in the park; he asked her for money, she refused, words passed, she hit him on the head with her pocketbook, and he took out the knife, chased her, and in one of the most frequented parts of the park in plain view of many persons, stabbed her 25 times. He apparently did not attempt to escape, and was promptly arrested by park policemen.

Within about an hour, at the police station, he gave the police a written statement, which at the trial was admitted in evidence without objection. At the trial he testified that she hit him on the head with her pocketbook, "and I don't remember anything after that * * * till I went to the police station"; on cross-examination he said, "I was under deep emotional strain, * * * Q. You heard the statement you gave to the police read the last time this case was up [before a three weeks adjournment granted at appellant's request], it gave all the details and they learned that from you? A. Not necessarily. I am not familiar with the detachment [sic] of the police department. They could have put that down themselves. At the time I am sure I was in no condition to give a statement." Except as to alleged lapse of memory, there seems to be no substantial difference between the statement and appellant's testimony. He did not testify that the statement was obtained by force, threats or inducements held out. No motion was made to strike out the statement or request to withdraw assent

to admission of it in evidence. In this court appellant apparently relied on the statement as his version—and a true statement—of the facts of the case. The autopsy showed the 25 stab wounds.

In the only medical evidence, Dr. Guttmacher's report, offered in evidence by agreement, the opinion is expressed that appellant "is a responsible agent, though he is certainly a very unstable individual." Before this conclusion it is said, "Apparently circumstances got to a point that he lost all of his self-control and committed a murder in which he stabbed the deceased twenty-five times." Appellant contends that there is no evidence of premeditation and that the nature and circumstances of the crime negative the possibility of premeditation. However, he recognizes the limited scope of our review on appeal, *viz.*, that under existing procedure we cannot review the weight or even the legal sufficiency of the evidence to show that he is guilty of the crime of which he was convicted, *i. e.*, murder in the first degree, or consequently the, to him all-important, question whether he should be hanged. In his brief and at the argument, therefore, he asks review only of two rulings, or groups of rulings, on evidence, which he says were erroneous and directly tended to an erroneous finding of premeditation. A careful examination of the entire transcript indicates that these rulings were the only rulings adverse to appellant made by the lower court.

For a few weeks before the killing the girl was living temporarily with her maternal grandmother and aunt. On the Thursday evening before the killing the grandmother and aunt were in the living room; the girl and appellant were in the kitchen. The aunt testified, "Mother and I were sitting in the living room, and we heard loud voices in the kitchen. We hastened to the kitchen and just as we got to the kitchen door we heard John say, Ruby I am going to kill you, and mother said, John, what is the trouble, what is the trouble, and he says, John Knowles says, oh, nothing, Mrs. Davis, no trouble at all." The grandmother also testified, "My daughter

and I were sitting in the living room. We heard loud noises, and when he said, I am going to kill you, Ruby, we rushed right out and rushed in the kitchen, and I said, Why, why, John, what is the trouble? He said, nothing, Mrs. Davis, nothing, Mrs. Davis." Appellant "recognizes that as a general rule of evidence prior threats against deceased are admissible in the trial of an indictment for murder in proof of premeditation", but argues that this testimony "fails to meet the requirements of a prior threat so as to fall within the general rule", because the conversation took place in another room, outside the physical presence [but within the hearing] of the witnesses, and was "so vague and indefinite as to fail to carry with it any certainty, much less demonstrate clearcut intention to carry out" the threat made, and because "among negroes of this type such intemperate language is so commonly used in everyday speech that within this class of society such a statement fails to carry with it any real or apparent threat to life or limb". This argument could be, and doubtless was, made to the trier of facts against the weight of the evidence, but has no bearing on its admissibility. A threat to kill is a threat to kill. It may or may not be made seriously. It is not conclusive, but ordinarily it is admissible, to show premeditation. Cf. *Esterline v. State,* 105 Md. 629, 632, 66 A. 269; *Frick v. State,* 128 Md. 122, 124-128, 97 A. 138; *Cross v. State,* 118 Md. 660, 662, 86 A. 223.

The grandmother also testified that on the following evening, Friday, appellant was at her house again. "Q. What happened that night, if anything? A. He went out and came back in and rushed back toward the kitchen on through my room where I was lying. After a while she came in, and he went on out down the hall, and went outside. She came down and said—(Mr. Siegel) we object. Q. You can't tell what she said, but did you notice anything unusual about her? A. Her face all swole up. (Mr. Siegel) We object to that. (The Court) Sustained, strike it out. Q. What did she do after that? A. She called up. Q. What did she do? (Mr. Siegel)

That is all out of the presence of the defendant. (The Court) Yes, sustained. It might be admissible that she made a call, and then you would get into other things, and it would be pretty meaningless. Q. Do you know whether or not she did anything at the Northwestern Police Station? (Mr. Siegel) We object. (The Court) Overruled. A. Not as I know of. (The Court) She doesn't know. Q. I didn't hear the answer. A. Did she do what. Q. I asked you if she did anything at the Northwestern Police Station. A. No. Q. You don't know. All right, your witness. (Mr. Siegel) No questions." This testimony may be susceptible of two interpretations, one favorable to appellant, *viz.*, that deceased did not do anything at the police station, one purely negative, *viz.*, that witness did not know whether deceased did anything. In either aspect, there was no ruling prejudicial to appellant, the question objected to either was answered favorably to appellant or was not answered at all.

Appellant relies upon *Duffy v. State*, 151 Md. 456, 469-470, 135 A. 189, in which it was said that ordinarily error in overruling an objection to a question is not reversible where the question is not answered or where the answer is negative or favorable to the appellant, but there may be cases in which such an error may be prejudicial, as where the erroneous examination is so persistent and extended, or the question is so framed, as to amount to an accusation [of a crime of which the accused had never been convicted] which is likely to create a prejudice in the minds of the jurors against the accused. It was held that the action of the State's attorney in asking such questions of the accused on cross-examination, after he had been informed by the court that they were inadmissible unless there had been a conviction (or an equivalent agreement to leave the city) amounted to an unfounded assertion that there had been such a conviction (or agreement) and, taken in connection with his persistence in asking similar questions against the instructions of the court, may well have prejudiced the jury against the

accused. The *Duffy* case was decided on its own peculiar facts and is not authority for overthrowing an elementary rule of evidence and expanding a narrow exception into a general rule that an unanswered objectionable question is reversible error. In the instant case, evidence that the girl had sworn out a warrant, or made complaint, against appellant at the police station would not necessarily have been improper or inadmissible. It would have been admissible if followed up by evidence that before the killing appellant had learned of her action or possibly by other evidence. *Jones v. State*, 182 Md. 653, 655-657, 35 A. 2d 916. As the witnesses failed to testify to any action by the girl at the police station, no such evidence was introduced and no ruling on such evidence is before us.

The State argues that the question of admissibility of the evidence of the threat was not adequately reserved by objections at the trial. As we have reviewed this question on the merits, it is unnecessary to consider this argument.

*Judgment affirmed, without costs*