DORIS ANN FOSTER, a/k/a Nuketa Leah
Ansara v. STATE OF MARYLAND

[No. 175, September Term, 1981 and
No. 35, September Term, 1982.]

*Decided June 7, 1983.*

*Motion For Reconsideration denied September 16, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Martha Weisheit, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellant.

*Jillyn K. Schulze, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., concur in part and dissent in part. SMITH, J., filed a concurring and dissenting opinion at page 221 *infra,* in which MURPHY, C. J., and RODOWSKY, J., concur. Order on Motion for Reconsideration at page 230 *infra.* ELDRIDGE, J., filed an opinion concurring in the denial of the motion for reconsideration at page 230 *infra.*

On 1 February 1982, in the Circuit Court for Cecil County, a jury convicted the appellant, Doris A. Foster (accused), of felony murder, for "murder when engaged in the perpetration of a robbery." The trial court imposed the death penalty. This appeal followed.

On appeal, the accused claims that the trial court committed numerous prejudicial errors in the course of the pretrial proceedings, the trial proceedings, and the sentencing proceedings. More particularly, the accused contends that the trial court erred in refusing to admit exculpatory hearsay testimony critical to her defense. Because we find that the trial court committed prejudicial error by refusing to admit such evidence, we shall reverse the conviction.

I

Background

At the trial, two conflicting versions of the circumstances surrounding the commission of the crime were presented. Both direct and circumstantial evidence were produced by the State to show that on 29 January 1981, the accused killed Josephine Torres Dietrich (victim) who lived in and was the manager of the Maryland Manor Motel (motel), a motel in which the accused and Tommy Foster, her husband (husband), also resided. The direct evidence was adduced primarily by the accused's husband and Elizabeth Phillips, the accused's daughter (daughter), who was 16 years old at the time of the murder. Their testimony concerning the

events of the evening of 29 January and the morning of 30 January, although containing certain inconsistencies, was generally as follows:

According to the accused's daughter, at about 5 p.m. on 29 January, the accused, her daughter, and a friend left the daughter's grandmother's apartment. While driving back to the accused's motel, the three women drank a considerable amount of beer and the accused began to talk about robbing a woman. The friend refused to participate and was dropped off. Upon returning to the accused's motel room, the accused and her daughter continued to drink beer. The subject again turned to robbery. The accused said that she wanted to rob the victim and to kill her.

Ultimately, the accused went into the bathroom and came out holding a screwdriver. The accused and her daughter walked toward the victim's office. The accused knocked on the door, told the victim that she heard noises next door, and asked the victim to check on them. The victim accompanied the accused and her daughter to Room One, a vacant room next to the accused's room, and went inside to check. As the victim moved toward the door to leave, the accused started stabbing her. The daughter, who did not want the accused to kill the victim, told the accused that the police were coming. The accused and her daughter left the room and went to the back of the motel, where the accused threw the screwdriver into the woods.

The accused and her daughter returned to the accused's motel room where, after drinking more beer, the accused said that "she [the accused] had to kill her [the victim] because she [the victim] knew who she [the accused] was." The accused picked up another screwdriver and went back to the motel room where the stabbing had taken place. When she returned to her own motel room, she told her daughter that she had stabbed the victim in the heart.

According to the accused's husband and daughter, several hours later at about 11:30 p.m. or midnight, the accused and her daughter picked up the accused's husband at work. The daughter told him that the accused had killed the victim.

The husband decided that the evidence had to be removed. He cleaned up the room, carried the body into the car, and placed a concrete block and rope in the car. The accused, her husband, and daughter then drove to the Chesapeake and Delaware Canal where, after the concrete block was tied to the body with the rope, the body was dropped. When they returned to the motel, they went to the victim's room where they found money, a TV set, and several other items that they took back to the accused's room.

Some circumstantial evidence was adduced by the State to show that the accused had committed the crime. A social worker testified that, on the afternoon of the murder when the victim withdrew some cash from a bank, she folded the money lengthwise. Various other witnesses testified that shortly after 30 January they observed the accused in possession of large amounts of money folded lengthwise.

At the trial, a different version of the circumstances surrounding the crime was presented by the accused. She produced direct evidence to show that on 29 January her husband and daughter killed the victim. The direct evidence consisted of the testimony of the accused herself and letters and statements written or made by her husband. The accused's testimony concerning the events of the evening of 29 January and the morning of 30 January, although inconsistent with her previous testimony at trial, was as follows:

On the evening of 29 January, the accused and her daughter picked up the accused's husband at work. After returning to the motel, they drank some beer, and the accused went to sleep. When she awoke, her daughter was going in and out of the accused's motel room. The accused went outside and saw the victim lying on the grass. When she asked her husband what had happened, he replied that the victim was dead. The accused's husband and daughter then put the body in the car and took a cinder block with them. When her husband returned, he and the accused went into the victim's room and took her money.

In a letter dated 30 January, allegedly written by the accused's husband to her,[1] he in essence admitted that he had killed the victim. In addition, in a letter postmarked 19 June 1981 addressed to "The Attorney General, Cecil County, MD," written by the accused's husband,[2] he not only confessed that he killed the victim and was solely responsible for her death, but also described in detail the circumstances surrounding the murder.

According to the letter, after returning to the accused's motel room after work, the husband noticed that a light was on in the vacant adjoining room. He decided that the victim was there and went to tell her that he had the parts necessary to fix a bathroom that she had asked him to repair. At the time, he had a screwdriver in his hand. When he entered the vacant adjoining room, the victim lashed out at him, telling him he was in the wrong room; that he should not make any repairs; and that she was not going to pay him. Her screaming went on and on, and he stabbed her to death. Ultimately, he removed her body and disposed of it in the "bay." Thereafter, he returned to the accused's motel room where she was still sleeping.

The letter further said that the accused's daughter must have seen the murder because she was in the accused's room crying and was really frightened. The husband enlisted the daughter's help to make the adjacent vacant room look as if it had been robbed. The daughter found a large amount of money, which the husband took. Thereafter, they returned to the accused's motel room. According to the husband's letter, "the accused was asleep during all of this."

At the trial, there was evidence that cast doubt upon the credibility of each of the three primary witnesses, the accused's husband, her daughter, and the accused herself. The husband's confessions that he had committed the

---

1. On 11 May 1981, the husband told a police officer that he had written the 30 January letter and that its contents were true. At trial, however, the accused's husband denied that he had written the 30 January letter.

2. At trial, the accused's husband admitted writing this letter. He explained that he had lied in the letter in order to protect the accused.

murder seriously discredited his trial testimony concerning the circumstances surrounding the commission of the crime. Additionally, on cross-examination, the accused's husband conceded that, although he himself had been charged with the murder, he had not been prosecuted. Rather, a plea bargain was arranged in which he was allowed to plead guilty to obstruction of justice and theft of property over $300 in exchange for his testimony against the accused. Finally, there were certain discrepancies between the testimony of the accused's husband and that of her daughter.

Additionally, there was evidence to discredit the accused's daughter's version of the circumstances surrounding the commission of the crime. On cross-examination, the accused's daughter conceded that Maryland State Troopers had told her that she could be prosecuted for the murder and that the death penalty could be imposed. She further testified that ultimately she entered into an agreement that she would not be prosecuted for the murder or any other related crime in exchange for her testimony against the accused.[3]

Moreover, although the accused's daughter herself testified at trial that the crime was a murder committed in the course of a robbery, there was other evidence to show that on the evening of the crime, she had described the circumstances surrounding its commission quite differently. The accused's husband testified that on 29 January, after the

---

3. With respect to the basis of the agreement, the following colloquy took place:

"Q [Mr. Podolak, Assistant State's Attorney] After they told you about [the possible charges and penalties], you entered into an agreement with them that you would testify if they didn't prosecute you, didn't you?

"A [accused's daughter] No, that wasn't the way it happened.

"Q You did eventually enter into an agreement with them that they would not prosecute you if you testified, isn't that true?

"A After they were convinced that, you know —

"Q They felt you were telling them the truth?

"A Yes.

"Q Okay. And after that, they agreed not to prosecute you, right?

"A Yes."

accused and her daughter picked him up from work and they returned to the accused's motel room, the accused's daughter told him that the victim was dead. According to the husband, the daughter then described the circumstances surrounding the commission of the crime as follows:

> "She [the daughter] said that [the victim] was in Room No. 1 cleaning, and [she] and [the victim] and [the accused] was in the room arguing about, I believe, [the daughter] being at the motel because [there was] some drinking going on, and [the victim] didn't particularly care for people coming by the motel and drinking. And [the daughter] told me that all of a sudden [the accused] snapped and started stabbing [the victim]."

In addition, there were discrepancies between the testimony of the accused's daughter and her husband.

Finally, there was evidence to discredit the accused's veracity. Her prior convictions on bad check charges and for burning of personal property were adduced. More important, the fact that on each of five occasions, two of them at trial, the accused offered different versions of the circumstances surrounding the commission of the crime seriously discredited her final version.

According to a police officer, on 1 February the accused, while being questioned by the police, was informed that the victim had been robbed and was missing. In response to questions, the accused offered an alibi, explaining that on the night of the crime she was at the home of one of her brothers.

After being arrested on 5 February, in response to questions, she stated that another brother might have been involved in the robbery. She also stated that she last saw the victim at 2 p.m. on 29 January when she took her husband to work.

Later, on 5 February, she volunteered to the police that they were investigating a murder, not a missing person; that her brother-in-law and one of her brothers had killed the

victim; and that she had seen the body which had been taken to an area near the bridge leading to Chesapeake City.

On 6 February, after being told that the body could not be located in Chesapeake City, she suggested to the police that they "go across the bridge and make a right and look in the water," the location at which the body was found. At that time, she continued to insist that her brother and brother-in-law had killed the victim.

At trial, the accused initially presented an alibi defense different from that previously offered to the police. The accused testified that at the time of the murder she had been involved in a relationship with Robert Shade, and was with him in Westchester, Pennsylvania, from the morning of 29 January to the morning of 31 January when she returned to the motel. There, the accused's husband handed her a letter in which he confessed that he had killed the victim. The accused then went to the victim's room and took $2500.

When, in rebuttal, the State produced evidence to show that Robert Shade had been incarcerated between 16 November 1978 and 10 April 1981, the accused explained that she had lied in order to protect her daughter. Thereafter, she offered her final version of the circumstances surrounding the commission of the crime — namely, that on the night of the murder she, her daughter, and her husband were at the motel; that she fell asleep; that when she awoke, she saw the victim lying dead on the grass; that her daughter and her husband disposed of the body; and that when her husband returned, he and she went into the victim's room and took her money.

## II

### Exclusion of Hearsay Testimony

At the trial, the accused's husband testified that on various occasions he had had several confrontations with the victim concerning his nonpayment of rent. On cross-examination, the following colloquy took place:

"Q [Mr. Jones, accused's attorney] Was there not an occasion in early January where she was asking you for the rent that was behind and in response that you verbally threatened her. Do you recall that experience?

"A [accused's husband] No, I sure don't.

"Q Do you deny that it happened?

"A I deny remembering it."

Thereafter, the accused called Helen Douglass, a friend of the victim who operated a motel nearby and who frequently spoke to her on the phone. Upon an objection by the State, the accused indicated that the witness's testimony was being proffered for the purpose of impeaching the husband's testimony and to show that at some time in January the accused's husband had threatened to kill the victim. In a conference held in the judge's chambers, the proffered witness testified as follows:

"A [Mrs. Douglass] All right. That she had called me on January the 12th. The reason I remembered is because I made a note of it. And I was told by [the victim] in a highly agitated state, that she said, 'If either one of those people come to your motel to rent or to be hired, don't do it. They are bad news.' I found my note. I have my note with me. It was in a box of things. I dug down through it, and I found it. . . .

. . .

"Q [Mr. Jones] What else did [the victim] tell you?

"A She told me she was afraid for her life, and she was crying. She was in a highly agitated state. I said, '. … you do not have to put up with this. Why don't you call the police?' And she said, 'They will not come. They won't help me unless I'm dead.' And I said, 'I don't really believe that.' I said, 'I think they would help because there is such a thing as

assault. And if you're in fear of your life, you can call and ask —' I advised her, because she was not nearly as capable a person as I am in being able to defend yourself verbally.

"Q What did she say specifically about which one she was afraid of?

"A She was more afraid of the man.

"Q Did she say why?

"A She said, '*He has threatened me.* He will not give me my rent,' is what she said. Now, I don't know what she meant by, 'He will not give me my rent.' I said, 'Why don't you have them evicted?' I said, 'I have evicted many people for nonpayment of rent.' It was a question of me trying to help her, and she was almost in a hysterical state.

"On January — I can — This one conversation worried me, and I thought she needed somebody besides —

"Q Did she say anything else then about how he threatened her or what he had said to her or just that he had threatened her?

"A *No, she said he had threatened to kill her. These were the words. He had threatened to kill her.*" (Emphasis added.)

The trial court found that the proffered testimony was hearsay, and that there was "a necessity for it," but that it was not sufficiently reliable to be admitted. Additionally, the trial court indicated that the accused could call her husband and could cross-examine him on the question whether he had threatened to kill the victim.

Relying upon *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038 (1973), and *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150 (1979), the accused contends that the trial court erred in refusing to admit the proffered hearsay evidence consisting of the testimony of a friend of the victim to the effect that the victim had told her the accused's husband had threatened to kill the victim. The accused points out that

there was evidence adduced to show that her husband was present at the motel at the time of the commission of the crime; that he participated in an attempt to avoid detection of the crime by cleaning up the room, and by removing and disposing of the victim's body; and that he shared in the proceeds of the robbery. More important, the accused adduced evidence in the form of letters to show that her husband had twice confessed to the killing. However, as a result of the exclusion of the proffered hearsay testimony, she was unable to adduce evidence to show that her husband had threatened to kill the victim. The accused contends that the excluded testimony was critical to her defense that her husband and daughter killed the victim. She concludes that the application of the hearsay rule, which prevented her from presenting a portion of her defense, rendered her trial fundamentally unfair and deprived her of due process of law.

In *Chambers*, the accused was charged with having killed a victim. A person other than the accused (McDonald) made, but later repudiated a written, sworn, voluntary confession that he had killed the victim. On three separate occasions, McDonald had orally confessed to three different friends that he had killed the victim.

At trial, Chambers defended on two grounds. He first attempted to show that he did not shoot the victim. Additionally, he attempted to show that McDonald had shot the victim. However, Chambers was only partially successful in adducing testimony supporting his defense. One witness testified that he saw McDonald shoot the victim, while another testified that he saw McDonald immediately after the shooting with a pistol in his hand. In addition, Chambers tried to show that McDonald had on four separate occasions confessed to the crime, once in the sworn written confession given to Chambers' attorney, and three other times orally to friends.

At trial, the State had not called McDonald as a witness. Chambers called McDonald and had his sworn extrajudicial confession admitted into evidence. On cross-examination, the State elicited the fact that McDonald had repudiated his

prior sworn written confession. In addition, McDonald testified that he was not present at the scene of the crime during the critical period, and that he did not shoot the victim.

Chambers made a motion to examine McDonald as an adverse witness which the trial court denied on the ground of the "voucher" rule. Defeated in his attempt to challenge directly McDonald's renunciation of his sworn confession, Chambers sought to introduce the testimony of the three witnesses to whom McDonald had orally confessed that he had shot the victim. The trial court sustained the State's objection to the proffered testimony of each of the three witnesses on the ground that it was inadmissible hearsay. Chambers was then permitted to present certain other testimony from other sources discrediting McDonald's alibi. Nevertheless, Chambers was never permitted to discredit McDonald's renunciation of his sworn confession.

The United States Supreme Court found:

> "As a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, [*Chambers*] *was unable either to cross-examine McDonald or to present witnesses in his own behalf* who would have discredited McDonald's repudiation and demonstrated his complicity.
>
> . . .
>
> Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." *Chambers,* 410 U.S. at 294, 93 S.Ct. at 1045 (emphasis added).

The Supreme Court recognized:

> "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *The rights*

*to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.*

. . .

Both of these elements of a fair trial are implicated in the present case." *Chambers,* 410 U.S. at 294-95, 93 S.Ct. at 1045 (emphasis added).

With respect to the voucher rule, the Supreme Court said:

"[A]s applied in this case, the 'voucher' rule's impact was doubly harmful to Chambers' efforts to develop his defense. Not only was he precluded from cross-examining McDonald, but, as the State conceded at oral argument, he was also restricted in the scope of his direct examination by the rule's corollary requirement that the party calling the witness is bound by anything he might say. He was, therefore, effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession." *Chambers,* 410 U.S. at 296-97, 93 S.Ct. at 1046 (footnotes omitted).

With respect to the application of the hearsay rule, the Supreme Court initially recognized that that rule is grounded in the notion that untrustworthy evidence should not be presented to the triers of facts and that extrajudicial statements are traditionally excluded because they lack indicia of reliability; they are not under oath; the declaration is not subject to cross-examination; and the unavailable declarant's demeanor and credibility cannot be assessed by the jury. The Court further recognized that a number of exceptions to the hearsay rule have developed over the years to allow admission into evidence of hearsay statements made under circumstances that tend to assure reliability, among which is the declaration against interest, an exception founded on the assumption that a person is unlikely to fabricate a statement that is against his own interest. After

pointing out that courts in Mississippi applied this exception to declarations against pecuniary interest but not to those against penal interest, the Supreme Court said:

"The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that *provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case* — McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. *Third,* whatever may be the parameters of the penal-interest rationale, *each confession here was in a very real sense self-incriminatory and unquestionably against interest.* McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to 'mess him up.' *Finally,* if there was any question about the truthfulness of the extrajudicial statements, *McDonald was present in the courtroom and was under oath.* He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, Brown v. State, *supra,* and from the *Donnelly*-type situation, since in both cases the declarant was unavailable at the time of trial.

*"Few rights are more fundamental than that of an accused to present witnesses in his own defense.* In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. *The testimony rejected by the trial court here bore persuasive assurances of trustworthiness* and thus was well within the basic rationale of the exception for declarations against interest. *That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."* *Chambers,* 410 U.S. at 300-02, 93 S.Ct. at 1048-49 (citations omitted) (footnotes omitted) (emphasis added).

In sum, with respect to the hearsay rule, the Supreme Court determined that, because the proffered hearsay statement constituted evidence critical to the defense and bore persuasive assurances of trustworthiness, the hearsay statement should have been admitted. Moreover, in determining whether the proffered hearsay testimony contained sufficient assurances of trustworthiness, the Court considered a variety of relevant factors, including the fact that the statement was made spontaneously to a close acquaintance shortly after the murder; that the statement was corroborated by some other evidence including the declarant's sworn confession; that the statement was against interest; and that the declarant was present in the courtroom.

The Supreme Court then held that under the facts and circumstances of the case the application of two specific rules of evidence — the voucher rule that prevented cross-examination, and the hearsay rule that excluded critical evidence — deprived the accused of a fair trial. In reaching this result, the Supreme Court said:

> "*We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.* In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Chambers,* 410 U.S. at 302-03, 93 S.Ct. at 1049 (emphasis added).

Thus, the Supreme Court indicated that rules of evidence could not be applied if, under the facts and circumstances of the particular case, their application deprived the accused of a fair trial.

In *Chambers,* the Supreme Court expressly stated that it was not deciding whether the application of a single rule of evidence (i.e., the voucher rule or the hearsay rule) would result in a denial of due process. That question was determined in *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150 (1979). There, after Green was found guilty of murder, a second proceeding was held to decide whether capital punishment should be imposed. Green sought to prove that he was not present when the victim was killed and had not participated in the murder. He attempted to introduce testimony of a witness to the effect that Moore, an accomplice previously convicted of the victim's murder, had told the witness that he had killed the victim. The trial court refused to admit the evidence on the ground that it was hearsay.

In a per curiam opinion, the Supreme Court said:

"*Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue* in the punishment phase of the trial, *and substantial reasons existed to assume its reliability.* Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. In these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' Because the exclusion of Pasby's testimony denied petitioner a fair trial on the issue of punishment, the sentence is vacated and the case is remanded for further proceedings not inconsistent with this opinion." *Green,* 442 U.S. at 96-97, 99 S.Ct. at 2151-52 (citations omitted) (footnotes omitted) (emphasis added).

The Supreme Court concluded that under the facts and circumstances of the case the application of a single rule of evidence — the hearsay rule that excluded reliable evidence critical to the defense — deprived the accused of a fair trial.

In *Green,* the Supreme Court established that a single rule of evidence — the hearsay rule — could not be applied if, under the facts and circumstances of the particular case,

its application deprived the accused of a fair trial.[4] We shall apply this principle here.

In this case, we are concerned with the admissibility of testimony by a friend of the victim to the effect that the victim had told her that the husband of the accused had threatened to kill the victim. Thus, we are presented with the compound question of the admissibility of each of two extrajudicial statements — one by the accused's husband made to the victim, and the other by the victim made to her friend.

---

4. Some courts in other jurisdictions, applying the principle stated in *Chambers* and *Green* to cases involving various facts and circumstances, have found a denial of due process. *E.g.,* United States v. Benveniste, 564 F.2d 335, 341-42 (9th Cir. 1977) (exculpatory statement — hearsay); Welcome v. Vincent, 549 F.2d 853, 859 (2d Cir.), *cert. denied,* 432 U.S. 911, 97 S.Ct. 2960 (1977) (confession — voucher); United States v. Goodlow, 500 F.2d 954, 958 (8th Cir. 1974) (confession — hearsay); People v. Ireland, 38 Ill.App.3d 616, 621-22, 348 N.E.2d 277, 281-82 (1976) (confession — hearsay). *But see, e.g.,* United States v. MacDonald, 688 F.2d 224, 232-33 (4th Cir. 1982), *cert. denied,* U.S. , 103 S.Ct. 726 (1983) (confession — hearsay); Lipinski v. New York, 557 F.2d 289, 294 (2d Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1262 (1978) (prior inconsistent statement — voucher); United States v. Brandenfels, 522 F.2d 1259, 1264 (9th Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 564 (1975) (confession — hearsay); Maness v. Wainwright, 512 F.2d 88, 91-92 (5th Cir. 1975), *cert. dismissed,* 430 U.S. 550, 97 S.Ct. 1593 (1977) (exculpatory statement — voucher); Quigg v. Crist, 466 F.Supp. 544, 551 (D. Mont. 1978), *aff'd,* 616 F.2d 1107 (9th Cir. 1980) (threat — hearsay); State v. DeFreitas, 179 Conn. 431, 454-55, 426 A.2d 799, 810 (1980) (confession — hearsay); People v. Tate, 87 Ill.2d 134, 145, 429 N.E.2d 470, 476 (1981) (confession — hearsay); Taggart v. State, 269 Ind. 667, 671, 382 N.E.2d 916, 919 (1978) (confession — hearsay); Ellison v. Commonwealth, 219 Va. 404, 411-12, 247 S.E.2d 685, 689-90 (1978) (confession — hearsay).

Other courts, applying similar principles to cases involving the exclusion of evidence on grounds other than the hearsay or voucher rules, have similarly found a denial of due process. *E.g.,* Washington v. Texas, 388 U.S. 14, 22-23, 87 S.Ct. 1920, 1925 (1967) (confession — accomplice disqualification); Parisie v. Greer, 671 F.2d 1011, 1016 (7th Cir. 1982) (homosexuality — embarrassment); Pettijohn v. Hall, 599 F.2d 476, 481 (1st Cir.), *cert. denied,* 444 U.S. 946, 100 S.Ct. 308 (1979) (identification — relevance); Hackett v. Mulcahy, 493 F.Supp. 1329, 1340 (D. N.J. 1980) (alibi defense — timeliness); State v. Alford, 289 N.C. 372, 389, 222 S.E.2d 222, 233, *vacated in part sub nom.* Carter v. North Carolina, 429 U.S. 809, 97 S.Ct. 46 (1976) (confession — severance). *But see, e.g.,* Nick v. United States, 406 F.Supp. 1, 3 (E.D. Mo. 1975), *aff'd,* 531 F.2d 936, 937 (8th Cir. 1976) (impeachment — sequestration); State v. Cavallo, 88 N.J. 508, 528-29, 443 A.2d 1020, 1030 (1982) (expert testimony — unaccepted scientific premise).

These cases are not considered in detail here because the facts upon which they depend are too diverse.

In Maryland, the hearsay rule ordinarily does not preclude admission into evidence of testimony concerning an accused's voluntary extrajudicial confession or incriminating statement. *See, e.g., Vines v. State,* 285 Md. 369, 381, 402 A.2d 900, 906 (1979); *Bunn v. Warden,* 242 Md. 399, 400, 219 A.2d 37, 38 (1966); *Schowgurow v. State,* 240 Md. 121, 136, 213 A.2d 475, 485 (1965); *Nicholson v. State,* 38 Md. 141, 154 (1873). An accused's threat to kill the victim is also admissible. *See, e.g., Knowles v. State,* 192 Md. 664, 669, 65 A.2d 179, 180-81 (1949); *Frick v. State,* 128 Md. 122, 128, 97 A. 138, 140 (1916); *Cross v. State,* 118 Md. 660, 662, 86 A. 223, 224 (1912). Similarly, an extrajudicial confession by a person other than the accused is admissible. *E.g., Brady v. State,* 226 Md. 422, 428-29, 174 A.2d 167, 170 (1961), *aff'd,* 373 U.S. 83, 83 S.Ct. 1194 (1963); *Thomas v. State,* 186 Md. 446, 452, 47 A.2d 43, 46 (1946). This Court has not previously decided whether the hearsay rule precludes from evidence testimony concerning a threat to kill the victim made by a person other than the accused. Here, however, we need not consider whether under Maryland law the hearsay rule would exclude such testimony whether proffered by a person who heard the threat made, or by a person to whom the threat was reported. Regardless of whether the proffered testimony is inadmissible because of Maryland's hearsay rule, under the facts of this case, its exclusion deprived the accused of a fair trial in violation of the Due Process Clause of the Fourteenth Amendment.

Here, the crux of the accused's defense was that she had not committed the murder, but rather that her husband and her daughter had committed that crime. Thus, the central issue in the case related to the credibility of the accused, her daughter, and her husband. There was much evidence to cast doubt upon the credibility of each of the three primary witnesses. In essence, the jury was required to determine whether to believe the husband's and daughter's version of the facts that the accused had committed the murder, the accused's version of the facts that her husband and daughter had committed the murder, or neither version of the facts.

Although the accused was permitted to adduce some evi-

dence to show that her husband had killed the victim, she was, nonetheless, precluded from presenting a portion of her defense. In view of the fact that the accused bears no burden of proof, but needs only to raise a reasonable doubt in the minds of the jury, *e.g., In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970); *State v. Evans,* 278 Md. 197, 206, 362 A.2d 629, 634 (1976); *State v. Grady,* 276 Md. 178, 181-82, 345 A.2d 436, 438 (1975), the proffered testimony that the accused's husband had threatened to kill the victim was a critical additional piece of evidence tending to show that the husband had killed the victim.[5] Under these circumstances, the excluded testimony was highly relevant to the central issue in the guilt phase of the trial. Indeed, as the trial court found, it was necessary to the accused's defense.

Moreover, sufficient indicia of reliability were present to assure the proffered testimony's trustworthiness. The husband's threat was made spontaneously during an argument with the victim over the payment of rent, and was a statement against interest. The victim's extrajudicial statement was made spontaneously at a time when she was excited, and under circumstances in which she had no reason to lie. Additionally, her extrajudicial statement was made shortly before the murder to a close acquaintance with whom she had previously exchanged information about tenants. Both the accused's husband's threat and the victim's extrajudicial statement were corroborated by other evidence — the accused's husband's two written confessions, the accused's testimony that her husband was present at the

---

5. There is no merit to the State's contention that the accused's right to impeach her husband's testimony was adequately protected by the trial court's offer to permit the accused to call her husband as an adverse witness. The record shows that at the trial the husband had previously testified that he did not remember making any threats. It was highly unlikely that that testimony could have been effectively impeached by further questioning of the husband as an adverse witness. Moreover, the accused was entitled to impeach this testimony by extrinsic evidence of a prior inconsistent statement. *E.g.,* State v. Kidd, 281 Md. 32, 46 n.8, 375 A.2d 1105, 1114 n.8, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646 (1977); Moxley v. State, 205 Md. 507, 516, 109 A.2d 370, 374 (1954). Here, the only extrinsic evidence of a prior inconsistent statement consisted of the testimony of the victim's friend that was excluded from evidence by the hearsay rule. Thus, despite the trial court's offer, the accused was deprived of an effective opportunity to impeach.

time of the commission of the crime, and the accused's husband's testimony that he cleaned up the room in which the murder took place, removed and disposed of the body, and shared in the proceeds of the robbery. Finally, if there was any question about the reliability of either the husband's or the victim's extrajudicial statements, the accused's husband was present in the courtroom, under oath, and was available for cross-examination by the State before the jury. Thus, the testimony rejected by the trial court bore persuasive assurances of trustworthiness.

Under the circumstances here, the accused's constitutional right to call a witness in her own behalf, a right that directly affected the ascertainment of her guilt, was implicated. We conclude that the hearsay rule excluded evidence that was critical to the defense and that bore persuasive assurances of trustworthiness. As a result of this exclusion, the accused's defense was far less persuasive than it might have been had the husband's threat been admitted. Under the facts and circumstances of this case, the exclusion of exculpatory hearsay evidence deprived the accused of a fair trial and, therefore, of due process of law. Accordingly, we shall reverse the judgment of the trial court.

## III

### Sufficiency of the Evidence

Our reversal in this case rests upon trial error ordinarily permitting remand for a new trial. *Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149 (1978). However, on appeal the accused has raised an issue of evidentiary insufficiency that, if found, would require reversal without remand for a new trial. *Burks,* 437 U.S. at 16, 98 S.Ct. at 2149-50. Consequently, it is necessary that we comment upon this issue.

## A

### Presence

The accused contends that the evidence was insufficient to sustain her conviction for felony murder because there was insufficient evidence to establish an element of the underlying felony of robbery — that the property taken was taken from the victim's "presence." Although this Court has recognized that robbery involves " 'the felonious taking and carrying away of the personal property of another from his person or in his *presence* by the use of violence or by putting him in fear,' " *Hadder v. State,* 238 Md. 341, 354, 209 A.2d 70, 77 (1965) (emphasis added), we have not previously considered the scope of the term "presence."

Courts in other jurisdictions that have considered the scope of the term generally agree that "presence" involves proximity and control. *E.g., Cobern v. State,* 273 Ala. 547, 551, 142 So.2d 869, 871 (1962); *Clements v. State,* 84 Ga. 660, 664, 11 S.E. 505, 506 (1890); *State v. Constantine,* 342 A.2d 735, 737 (Me. 1975); *Lancaster v. State,* 554 P.2d 32, 34 (Okla.Crim. 1976). Indeed, courts and commentators have described "presence" as requiring that the property taken must have been close enough to the victim and sufficiently under the victim's control that, had the latter not been subject to violence or intimidation by the robber, he could have prevented the taking. *E.g., Commonwealth v. Homer,* 235 Mass. 526, 533, 127 N.E. 517, 520 (1920); *Fields v. State,* 364 P.2d 723, 726 (Okla.Crim. 1961); *see, e.g.,* W. LaFave & A. Scott, *Criminal Law* § 94 at 696 (1972); 4 C. Torcia, *Wharton's Criminal Law* § 473 (14th ed. 1981); 67 Am.Jur.2d *Robbery* § 12 (1973); 77 C.J.S. *Robbery* § 9 (1952). Thus, as stated as long ago as 1920, in *Commonwealth v. Homer,* 235 Mass. 526, 533, 127 N.E. 517, 520 (1920):

> " 'A thing is in the presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.' "

Courts applying this principle have consistently held that property has been taken from the victim's presence if it was taken from a room in a building other than that in which the victim was present, *e.g., State v. Calhoun,* 72 Iowa 432, 436, 34 N.W. 194, 196 (1887); *Constantine,* 342 A.2d at 737; from a car parked outside the building, *e.g., Cobern,* 273 Ala. at 551, 142 So.2d at 871; *State v. Hayes,* 518 S.W.2d 40, 43 (Mo. 1975); *Lancaster,* 554 P.2d at 34; *Fields,* 364 P.2d at 726, or from another building on the premises, *e.g., Clements,* 84 Ga. at 664, 11 S.E. at 506.

Here, there was evidence to show that the victim's property was taken from a room in a motel other than the one in which the victim was present at the time of the murder. This evidence was sufficient to support an inference that the victim's money was close enough and sufficiently under the victim's control for her to have prevented its taking had she not been killed. Thus, this evidence, if believed, was sufficient to show that the property was taken from the victim's presence. Consequently, the evidence was sufficient to show that a robbery had in fact been committed.

## B

### In the Perpetration of a Felony

The accused next contends that the evidence was insufficient to support her conviction for felony murder because the murder and the robbery were not "clearly connected in point of time, place, and causal relation." She points out that the murder and the robbery occurred at different times and that "events transpired which significantly interrupted the 'continuity of action.'" She concludes that under these circumstances there was insufficient evidence to show that the murder was committed "in the perpetration" of the robbery. Md. Code (1957, 1982 Repl.Vol.), Art. 27, § 410.[6]

---

6. Art. 27, § 410 provides in pertinent part:

"All murder which shall be committed in the perpetration of . . . robbery . . . shall be murder in the first degree."

In support of this position, the accused relies upon only two cases, *State v. Adams,* 339 Mo. 926, 933, 98 S.W.2d 632, 637 (1936), and *Bizup v. People,* 150 Colo. 214, 218, 371 P.2d 786, 788 (1962). In each of these cases, the murder was committed while the perpetrators were leaving the scene after the underlying felony (burglary and robbery respectively) had been completed. Consequently, a question arose as to whether the murder was committed in the perpetration of the felony. In each of these two cases, the court held that notwithstanding the sequence of events the murder was committed in the perpetration of the felony. Manifestly, these cases are inapposite.

Here, the record shows that the underlying felony — the robbery — was not completed until after the murder had been committed, so that the question considered in *Adams* and *Bizup* does not even arise. Moreover, evidence of the killing constituted the only evidence adduced to show the existence of force, an element essential to establish the underlying felony of robbery. Under such circumstances, in the absence of any contention that there was insufficient evidence to support her conviction for robbery because there was insufficient evidence of force, logic dictates that the murder was committed in the perpetration of the felony.

We are persuaded on the basis of the record before us that the evidence was sufficient to sustain the conviction for felony murder. Accordingly, we shall remand the case for a new trial.

## IV

### Remaining Issues

In this case, our reversal and remand for a new trial rests upon the fact that the accused was denied a fair trial and, therefore, was denied due process of law. However, some of the remaining issues raised on appeal by the accused are likely to arise again at the new trial. Therefore, for the guidance of the trial court upon retrial, we shall comment upon those issues.

# A

## Pretext Arrest

Here, the record shows that on 5 February the accused was arrested in Delaware by Delaware arresting officers accompanied by Maryland police officers. Prior to her arrest, the Maryland police had informed the Delaware arresting officers that the accused was then in Delaware; that there was a Maryland fugitive warrant outstanding against her, that the Maryland police wanted to talk to her; and that the Maryland police wanted her arrested and taken into custody. Moreover, at the time of her arrest, she was placed in handcuffs, taken to the police barracks, and interviewed by a Maryland police officer. Most important, on the morning of the arrest, the Delaware arresting officer was assigned "to assist the Maryland police."

The Delaware arresting officer, however, testified that he had a dual purpose in arresting the accused. He conceded that one of his purposes was to arrest her because there was an outstanding Maryland "fugitive warrant." However, he also stated that one of his purposes was to arrest her because there were outstanding "Delaware bad check warrants."

At the time of her arrest, the accused, however, had not been served with copies of the Delaware bad check warrants. Moreover, on 5 February, after her arrest, the accused was charged and arraigned with respect to unrelated Delaware offenses. Indeed, the accused was not arraigned on the charges underlying the outstanding Delaware bad check warrants until 23 February. Ultimately, however, the accused was tried and convicted on the charges underlying the Delaware bad check warrants.

The accused contends that the trial court erred by failing to suppress certain evidence obtained as a result of a "pretext arrest." More particularly, the accused contends that her arrest on the outstanding Delaware charges was a pretext to obtain evidence of the victim's murder in Maryland.

This Court has recognized that an arrest may not be used as a pretext to search for evidence. *E.g., State v. Sedacca,* 252 Md. 207, 220-21, 249 A.2d 456, 465 (1969); *see, e.g., Williams v. State,* 6 Md.App. 511, 518, 252 A.2d 262, 266, *cert. denied,* 255 Md. 745 (1969), *cert. denied,* 397 U.S. 1036, 90 S.Ct. 1353 (1970). Additionally, this Court has stated that when an arresting officer has two or more purposes for making an arrest, one of which is to make a valid arrest for the commission of a crime and the other of which is to obtain evidence of a different crime, the duality of purpose will not, in and of itself, transform the arrest into a pretext arrest. *E.g., Sedacca,* 252 Md. at 221-22, 249 A.2d at 465; *see, e.g., Cornish v. State,* 215 Md. 64, 66-67, 137 A.2d 170, 172 (1957); *see also, e.g., Scott v. State,* 7 Md.App. 505, 529, 256 A.2d 384, 397 (1969), *cert. denied,* 256 Md. 747 (1970); *Williams,* 6 Md.App. at 519, 252 A.2d at 266.

Here the record shows that the Delaware arresting officer had as one of his purposes the effectuation of an arrest on valid Delaware charges upon which the accused was subsequently tried and convicted. There is nothing in the circumstances surrounding the accused's arrest that indicates that it was a mere pretext to obtain evidence of the Maryland crime.

## B

### Search and Seizure

Here, the record shows that before the accused was arrested, the Delaware arresting officer had been informed that the accused previously had been involved in various serious, violent crimes, including robberies. The accused was arrested in a small motel room in Delaware. At the time of her arrest, she was standing near her bed, and was approximately two feet away from a nightstand, the top drawer of which was open approximately four inches. The arresting officer patted down the accused in a search for weapons, and then handcuffed her with her hands behind her back. He then searched the area immediately around her

for weapons. In the partially open top drawer of the nightstand, the arresting officer saw a large amount of currency spread over the bottom of the drawer. He pulled the drawer open to check further for weapons and then continued to check the area immediately around the accused. Ultimately, he determined that she was unarmed and had no weapons directly available to her.

Thereafter, the accused asked the arresting officer to inventory the money in the open drawer of the nightstand so that she would know the exact amount. In the presence of a Maryland police officer, the Delaware arresting officer counted the money. At that time, the Delaware arresting officer was unaware of the money's evidentiary value, and took it solely to protect himself from later allegations of theft. Subsequently, the Maryland police officer, having noticed that the money had been folded lengthwise — the same way that the victim had folded her money — requested that the money be seized as evidence.

The accused contends that the trial court erred by failing to suppress evidence improperly seized incident to the accused's arrest. In essence, the accused asserts that, because she had been handcuffed after being arrested, it was impermissible to search the nightstand drawer, an area beyond her person.

In *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034 (1969), the United States Supreme Court established the permissible scope of a search incident to an arrest. There, it said:

> "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. *And the area into which an*

*arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of* the arrestee's person and the area 'within his immediate control' — construing that phrase to mean *the area from within which he might gain possession of a weapon or destructible evidence." Chimel,* 395 U.S. at 762-63, 89 S.Ct. at 2040 (emphasis added).

This principle has recently been restated in *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864 (1981), and has been applied by this Court. *Howell v. State,* 271 Md. 378, 385-86, 318 A.2d 189, 191 (1974).

This Court has not previously considered whether a search of an area beyond an arrestee's person is permissible if made after the arrested person has been handcuffed. Courts in some other jurisdictions that have considered similar questions, recognizing that even after an arrestee has been handcuffed there is a continuing potential for harm, have generally agreed that under such circumstances a search of an area from which possession of a weapon or destructible evidence might be gained is permissible. *E.g., United States v. Quigley,* 631 F.2d 415, 419 (5th Cir. 1980); *United States v. Mason,* 523 F.2d 1122, 1126 (D.C.Cir. 1975); *United States v. Ciotti,* 469 F.2d 1204, 1207 (3d Cir. 1972), *vacated on other grounds,* 414 U.S. 1151, 94 S.Ct. 907 (1974); *State v. Noles,* 113 Ariz. 78, 81-82, 546 P.2d 814, 817-18 (1976); *State v. Shane,* 255 N.W.2d 324, 327-28 (Iowa 1977); *State v. Cox,* 294 Minn. 252, 257, 200 N.W.2d 305, 309 (1972); *State v. Fitzpatrick,* 32 N.Y.2d 499, 508, 300 N.E.2d 139, 143, 346 N.Y.S.2d 793, 799, *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, *cert. denied,* 414 U.S. 1050, 94 S.Ct. 554 (1973); *State v. Cherry,* 298 N.C. 86, 97, 257 S.E.2d 551, 558 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165 (1980); *State v. Austin,* 584 P.2d 853, 856 (Utah 1978). *But see, e.g., United States v. Cueto,* 611 F.2d 1056, 1062 (5th Cir. 1980); *United States v. Berenguer,* 562 F.2d 206, 210 (2d Cir. 1977).

Under the circumstances here, it was reasonable for the arresting officer to search for a weapon in a partially open drawer located within two feet of the accused, even though she was then handcuffed. The fact that the accused was handcuffed necessarily restricted her freedom of movement and, consequently, the area within her reach, but did not necessarily eliminate the possibility of her gaining access to the contents of the nightstand's partially open top drawer. Indeed, the partially open top drawer of the nightstand — a natural place for a weapon to be hidden — remained an area of easy access for the accused, particularly if she had been able to break free of restraint. Thus, in order for the arresting officer to protect himself and the Maryland police officer then present from potential harm, it was necessary for the arresting officer to search for weapons in the nightstand drawer, an area within the handcuffed accused's reach. Moreover, the arresting officer made no effort to search anywhere other than the area immediately around the accused. Under these circumstances, the search and seizure incident to the accused's arrest was reasonable, and the evidence seized was properly admitted.

## V

### Conclusion

We have held that, under the facts and circumstances of this case, the trial court's application of the hearsay rule, which excluded evidence that was critical to the defense and that bore persuasive assurances of trustworthiness, deprived the accused of a fair trial and, therefore, of due process of law. Additionally, we have held that the evidence was sufficient to sustain the accused's conviction for felony murder. Accordingly, we shall reverse the judgment of the trial court and remand the case for a new trial.

> *Judgment of the Circuit Court*
> *for Cecil County reversed.*
> *Case remanded to that Court*
> *for a new trial.*
> *Costs to be paid by Cecil County.*

*Smith, J. dissenting:*

I dissent from so much of the opinion in this case as reverses the judgment of conviction upon the basis that hearsay evidence should have been admitted. I find no case which requires — or suggests — that the evidence here presented should be admitted.

Let us begin by examining the definition of hearsay. E. Cleary, *McCormick's Handbook of the Law of Evidence,* § 246, at 584 (2d ed. 1972), gives the following definition:

> "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."

*McCormick* further states in § 245:

> "In order to encourage witnesses to put forth their best efforts and to expose inaccuracies which might be present with respect to any of the foregoing factors, the Anglo-American tradition evolved three conditions under which witnesses ordinarily will be required to testify: oath, personal presence at the trial, and cross-examination. The rule against hearsay is designed to insure compliance with these ideal conditions, and when one of them is absent the hearsay objection becomes pertinent."
> *Id.* at 581-82.

Certain exceptions to the hearsay rule have come into our law. Indicia of reliability must exist in order for evidence to be admitted under one of those exceptions. *See generally,* D. Binder, *The Hearsay Handbook* (1975). Professor Irving Younger in his lectures on evidence might well ask the question, "Does it smell right?" One of those exceptions is declarations against interest. Many states have seen fit to restrict

such admissions to declarations against pecuniary or proprietary interest, excluding declarations against penal interest. See *McCormick* §§ 277-278. Maryland is among those which have discarded the restriction so as to admit a declaration against penal interest. See *Dyson v. State,* 238 Md. 398, 407, 209 A.2d 609 (1965), *vacated on other grounds,* 383 U.S. 106 (1966); *Wiggins v. State,* 235 Md. 97, 103, 200 A.2d 683, *cert. denied,* 379 U.S. 861 (1964); *Brady v. State,* 226 Md. 422, 174 A.2d 167 (1961), *affirmed,* 373 U.S. 83 (1963); *Thomas v. State,* 186 Md. 446, 47 A.2d 43 (1946); *Brennan v. State,* 151 Md. 265, 134 A. 148 (1926),[1] and *Harris v. State,* 40 Md. App. 58, 62-63, 387 A.2d 1152 (1978).

*Chambers v. Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and *Green v. Georgia,* 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979), upon which the majority relies, are not applicable. In both cases what was held admissible was a statement by another individual that he had committed the crime for which the defendants were on trial. As anyone can see, such a statement has earmarks of reliability. That is a far cry from what we have here.

Chambers was convicted of murdering a policeman. One of his defenses was that another person, McDonald, had shot the deputy in question. A lifelong friend of McDonald's testified that he saw McDonald shoot the officer. A second witness, a cousin of the officer, testified that he saw McDonald with a pistol in his hand immediately after the shooting. As Justice Powell put it for the Court:

"In addition to the testimony of these two witnesses, Chambers endeavored to show the jury that McDonald had repeatedly confessed to the crime. Chambers attempted to prove that McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn statement to Chambers' counsel and three other

---

1. 5 J. Wigmore, *Evidence in Trials at Common Law* § 1476, at 354 n. 9 (Rev. 1974), speaks of the opinion in *Brennan* as "excellent."

times prior to that occasion in private conversations with friends." 410 U.S. at 289.

Chambers asked the trial court to require McDonald to appear. The State did not call him as a witness, so Chambers did. He had McDonald's sworn confession read to the jury. The State responded by eliciting from McDonald that he had repudiated his prior confession, and that the only reason for it was that he had been promised he would not go to jail and would share in a tort recovery Chambers would bring against the town which employed the police officer. Chambers asked the court for permission to examine McDonald as an adverse witness, but the court refused, saying that he was hostile, but not adverse. On appeal the Supreme Court of Mississippi upheld the trial court's ruling, finding, according to the Supreme Court, "that 'McDonald's testimony was not adverse to appellant' because '[n]owhere did he point the finger at Chambers.' 252 So. 2d, at 220." 410 U.S. at 292.

Chambers then sought to introduce the testimony of the three other witnesses to whom McDonald had admitted that he shot the officer. The first one would have said McDonald told him the night of the shooting that he shot the officer in question. The State objected to the admission of this testimony on the ground that it was hearsay. The trial court sustained the exception. The second witness testified out of the presence of the jury that while he, McDonald and another were taking Chambers to the hospital McDonald said that he shot the deputy. The witness stated that one week later McDonald reminded him of their prior conversation and urged the witness not to "mess him up." Again an objection was urged and sustained on hearsay grounds. The third witness would have said that he had been a friend and neighbor of McDonald for about twenty-five years. The day after the shooting he and McDonald walked out to a well near McDonald's house and there McDonald told him that he

was the one who shot the officer. McDonald also told him that he had disposed of the revolver. Several weeks after the shooting this witness accompanied McDonald when he purchased a new weapon. Hearsay again was the reason for exclusion of the testimony.

Justice Powell described for the Court "Chambers' predicament," stating, "As a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, he was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity." *Id.* at 294.

It was in the context of the above that the Court said, "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Id.* The Court held Chambers had a right to cross-examine McDonald. It said that Mississippi's "voucher" rule, which did not let a party impeach his own witness, bore little relationship to the realities of the criminal process. To the extent the confession incriminated McDonald, it exculpated Chambers; and, the retraction inculpated Chambers to the same extent it exculpated McDonald. The voucher rule, as applied, interfered with Chambers' right to defend aginst the State's charges.

More relevant to this case is the Court's discussion as to the exclusion as hearsay of the testimony of the three witnesses who heard McDonald confess. Justice Powell said for the Court:

"The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to

cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *California v. Green,* 399 U.S. 149, 158 (1970). A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest — an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made. Mississippi recognizes this exception but applies it only to declarations against pecuniary interest." 410 U.S. at 298-99.

Justice Powell said for the Court that this "materialistic limitation on the declaration-against-interest hearsay exception appears to be accepted by most States in their criminal trial processes, although a number of States have discarded it." 410 U.S. at 299. As we have already noted, Maryland is among the states which have discarded this rule.

It becomes important to look at the circumstances existent in *Chambers,* which circumstances are absent in this case. Justice Powell summarized them for the Court:

"The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided con-siderable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case — McDonald's sworn confession, the testimony of an eye-witness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting,

and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. See *United States v. Harris,* 403 U.S. 573, 584 (1971); *Dutton v. Evans,* 400 U.S., at 89. McDonald stood to benefit nothing by disclosing his role in the shooting to any of this three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to 'mess him up.' Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. See *California v. Green,* 399 U.S. 149 (1970)." 410 U.S. at 300-01 (footnote omitted).

The Court went on to say:

"Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied

mechanistically to defeat the ends of justice." 410 U.S. at 302.

In *Green,* 442 U.S. 95, he and Moore were indicted together for the rape and murder of a woman. Moore was tried separately, was convicted of both crimes, and had been sentenced to death at the time Green's case reached the Supreme Court. Green had also been so convicted and sentenced to death. During sentencing Green sought to prove he was not present when the woman was killed and had not participated in her death. According to the Court:

"He attempted to introduce the testimony of Thomas Pasby, who had testified for the State at Moore's trial. According to Pasby, Moore had confided to him that he had killed Allen, shooting her twice after ordering petitioner to run an errand. The trial court refused to allow introduction of this evidence, ruling that Pasby's testimony constituted hearsay that was inadmissible under Ga. Code § 38-301 (1978)." 442 U.S. at 96 (footnote omitted).

It was in this context that the Court said that the exclusion of the evidence "constituted a violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 97. It said, "Substantial reasons existed to assume its reliability." *Id.* The Court further stated:

"Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. In these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973)." *Id.* at 97 (footnote omitted).

It is important to see the clearly distinguishing features between *Chambers* and *Green* on the one side and the case at bar on the other. The Supreme Court had before it in its cases confessions to close friends made by the murderers almost immediately after the crimes had been committed. It was the testimony of the friends as to these confessions to them which was sought to be admitted. Here there is a statement, not a confession, allegedly made by the murderer two and a half weeks *before* the murder. The statement is to the victim, not a close friend. The victim then allegedly related this statement to a business acquaintance of hers. It is the testimony of this acquaintance which is sought to be admitted, a long way from the situation in both *Chambers* and *Green,* where murder was confessed. Even these superficial observations demonstrate how much further the testimony sought to be admitted here is from that in *Chambers* and *Green.*

The factors which the Supreme Court relies upon to demonstrate reliability in the hearsay are key elements to compare here. In both Supreme Court cases the confessions were made spontaneously and to close friends shortly after the murder. Here the alleged threat was made two and a half weeks before the murder. We are not told when the victim made her statement relative to this alleged threat. We have no showing that it was made to a confidant. The statement was in no way against the interest of the declarant.

In *Chambers* there was ample evidence corroborating the confessions, e.g., sworn confessions, eye witness testimony, etc. Here there is a letter to the court, allegedly written by the husband, confessing to the crime. He denies writing the letter and he is supported in this statement by the defendant's own daughter who says that this letter is not in the handwriting of the husband. The only thing corroborating the hearsay testimony of Mrs. Douglass is her note allegedly written immediately after her conversation with the victim. This note says nothing more than that Douglass should not hire or rent to the Fosters because they are "bad news." It supports in no way threats to kill the victim by the husband or anyone else.

In *Chambers* and *Green* each confession was self-incriminating and against the declarant's interest. Here, although the husband's alleged threat may have been self-incriminating and against his interest, the statements of the victim certainly were not in any way incriminating or against her interest.

It can be seen that almost none of the criteria set forth by the Supreme Court in *Chambers* and *Green* is present here. It is important to note that in *Chambers* the Court concluded its opinion by stating:

> "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." 410 U.S. 302-03.

The Court closed its opinion in *Green,* as we have already stated, by speaking of "unique circumstances" and referring to *Chambers.* These statements show that it was not the intention of the Supreme Court for these two cases to be interpreted in a manner such that the states' rules of evidence, particularly as they relate to hearsay, would be selectively emasculated.

*Chambers* and *Green* do not mandate the reversal here. This evidence utterly fails to meet any test of reliability. The majority has been unable to produce any case holding evidence comparable to this should be admitted. Accordingly, I would affirm the conviction.

I am authorized to state that Chief Judge Murphy and Judge Rodowsky concur in the views here expressed.

ON MOTION FOR RECONSIDERATION

*ORDER*

Upon consideration of the Motion for Reconsideration and Stay of Issuance of Mandate filed in the above entitled case, it is this 16th day of September, 1983

ORDERED, by the Court of Appeals of Maryland, that the motion be, and it is hereby, denied.

/s/ Robert C. Murphy
Chief Judge

*Eldridge, J., concurring in the denial of the motion for reconsideration:*

I concur in this Court's denial of the State's motion for reconsideration, as I continue to believe that the proffered hearsay testimony of Helen Douglass, as to what the deceased victim told her, should have been admitted. Nevertheless, upon further reflection during the pendency of the motion for reconsideration, I have come to the conclusion that our holding concerning the admissibility of the testimony should not rest upon a constitutional ground. Without intimating any disagreement with the constitutional discussion in Judge Davidson's opinion, I simply believe that the constitutional question should not be reached in this case. Instead, our holding that Helen Douglass' testimony was admissible should be based entirely on this State's common law. This is in accord with our established policy that ordinarily a constitutional question should be avoided if a case can properly be decided upon a nonconstitutional ground.[1]

---

1. Recent cases recognizing this policy include Rutherford v. Rutherford, 296 Md. 347, 363 n.6, (majority opinion), 365, (dissenting opinion), 464 A.2d 228, 237 (1983); Avara v. Baltimore News American, 292 Md. 543, 554 n. 7, 440 A.2d 368 (1982); Employ. Sec. v. Balto. Lutheran H. S., 291 Md. 750, 754 n. 2, 436 A.2d 481 (1981); Town of Forest Heights v. Frank, 291 Md. 331, 336, 435 A.2d 425 (1981); Temoney v. State, 290 Md. 251, 259 n. 6, 429 A.2d 1018 (1981); Caplan Bros. v. Village of Cross Keys, 277 Md. 41, 45, 353 A.2d 237 (1976).

The Maryland law of evidence, unlike that in some other jurisdictions, is largely uncodified. It has developed on a common law basis, through the decisions of the courts. Although Judge Smith in his dissenting opinion correctly indicates that no prior Maryland case requires the admission of the hearsay testimony concerning Tommy Foster's threats, this is not determinative of the state law issue. As we have pointed out on many occasions, very recently by Chief Judge Murphy for the Court in *Harrison v. Mont. Co. Bd. of Educ.*, 295 Md. 442, 460, 456 A.2d 894 (1983), "the common law is not static; its life and heart is its dynamism — its ability to keep pace with the world while constantly searching for just and fair solutions . . . ." [2]

If, as the majority of this Court believes (*see* p. 212, *supra*), considerations of fairness require that the hearsay testimony be admitted under the circumstances of this case, such a holding can rest on the common law of evidence just as easily (if not more so) as on the Due Process Clause of the Fourteenth Amendment. Fairness is not a quality associated only with the due process clauses of the federal and state constitutions. Rather, as the above-quoted language from the *Harrison* case indicates, the search for fairness is part of the dynamism of the common law.

The proffered testimony regarding Tommy Foster's threats should not automatically be deemed inadmissible because it does not fall within any of the traditional categories of exceptions to the hearsay rule. Long ago Judge Learned Hand, in a district court opinion adopted by the Second Circuit, held that a particular hearsay statement, which was not admissible under "any express authority in point," should not be rejected "because it fulfills both the

---

**2.** *Accord:* Boblitz v. Boblitz, 296 Md. 242, 274, 462 A.2d 506 (1983); Moxley v. Acker, 294 Md. 47, 51-52, 447 A.2d 857 (1982); Williams v. State, 292 Md. 201, 217, 438 A.2d 1301 (1981); Felder v. Butler, 292 Md. 174, 182, 438 A.2d 494 (1981); Adler v. American Standard Corp., 291 Md. 31, 42-43, 432 A.2d 464 (1981); Condore v. Prince George's Co., 289 Md. 516, 530-532, 425 A.2d 1011 (1981); Kline v. Ansell, 287 Md. 585, 590, 414 A.2d 929 (1980); Lewis v. State, 285 Md. 705, 714-715, 404 A.2d 1073 (1979); Pope v. State, 284 Md. 309, 340-342, 396 A.2d 1054 (1979); Deems v. Western Maryland Ry., 247 Md. 95, 231 A.2d 514 (1967).

requisites of an exception of the hearsay rule, necessity and circumstantial guaranty of trustworthiness." *G. & C. Merriam Co. v. Syndicate Pub. Co.,* 207 F. 515, 518 (2d Cir. 1913). More recently, in *Dallas County v. Commercial Union Assur. Co.,* 286 F.2d 388, 397-398 (5th Cir. 1961), in an opinion by Judge John Minor Wisdom, the United States Court of Appeals for the Fifth Circuit held that a document was admissible not "as a 'business record,' nor as an 'ancient document,' nor as any other readily identifiable and happily tagged species of hearsay exception. It is admissible because it is necessary and trustworthy, relevant and material . . . ." Other cases have taken the same position. *See Butler v. Southern Pacific Company,* 431 F.2d 77, 79-80 (5th Cir. 1970), *cert. denied,* 401 U.S. 945, 91 S.Ct. 1196, 28 L.Ed.2d 325 (1971); *United States v. Barbati,* 284 F.Supp. 409, 411-412 (E.D.N.Y. 1968); *People v. Interest of W.C.L.,* 650 P.2d 1302, 1304-1305 (Colo.App. 1982); *State v. Letterman,* 47 Or.App. 1145, 616 P.2d 505, 508-509, 12 A.L.R.4th 1009 (1980), *aff'd* 291 Or. 3, 627 P.2d 484 (1981). *See also Thomas v. Owens,* 28 Md.App. 442, 450-451, 346 A.2d 662 (1975); *Letendre v. Hartford Accident & Indem. Co.,* 21 N.Y.2d 518, 524, 289 N.Y.S.2d 183, 188, 236 N.E.2d 467 (1968).

The principle set forth in the *G. & C. Merriam Co.* and *Dallas County* cases has been used to reverse and order a new trial when the trial judge had refused to admit hearsay evidence. For example, in *Johnstone v. State,* 92 Nev. 241, 548 P.2d 1362 (1976), the defendant was charged with two murders. Two other men had previously been convicted for their part in the same murders. Johnstone maintained that he was not present at the time of the murders, and he attempted at his trial to introduce the testimony of a detective who had spoken to a married couple staying at the motel where the murders took place. This couple had told the detective that they had seen two unkempt men prowling near the victims' room. Although it was inferable from this evidence that Johnstone was not with the other two men at the time of the murders, the trial court excluded the detective's testimony on hearsay grounds. The Supreme

Court of Nevada reversed. While holding that the statement was admissible on Nevada statutory grounds, the court pointed out that the statute endorsed the principles set forth by Judge Learned Hand in the *G. & C. Merriam Co.* case and Judge Wisdom in the *Dallas County* case. Recognizing that neither the absent couple nor the detective had any motive to lie, the court held the reliability requirement had been met and that the testimony should have been admitted.

The holdings in the above-discussed cases have been embodied in the recently enacted Federal Rules of Evidence, in Rule 803 (24). The provision in pertinent part states:

> "(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. . . ."

According to the committee note regarding Rule 803 (24),

> "[t]he committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of probativeness and necessity could properly be admissible.
>
> The case of Dallas County v. Commercial Union Assur. Co., Ltd., 286 F.2d 388 (5th Cir. 1961) illustrates the point."

*See also* 4 J. Weinstein & M. Berger, Evidence § 803 (24)[01] (1981 ed.).

I am not prepared at this time to take the position that any hearsay evidence is admissible which a trial judge believes to be necessary and trustworthy. Rule 803 (24) of the Federal Rules of Evidence has, at least in this State, led to some excesses with which I could not agree. My view as to the admissibility of Helen Douglass' testimony need not and does not go beyond the type of hearsay evidence involved in this case.

As Judge Davidson's opinion points out, in Maryland hearsay evidence of an accused's threat to kill the victim has long been held admissible. I would hold that, in a criminal case, hearsay evidence of threats made to the victim by someone other than the defendant is admissible if the evidence meets the requirements of necessity and reliability. For the reasons set forth in Judge Davidson's opinion, the requirements of necessity and trustworthiness were met in this case. Consequently, as a matter of state evidence law, I believe that Helen Douglass' proffered testimony should have been admitted.